THE STATE OF CONNECTICUT *vs.* GIOVANNI BAPTISTA ROSA.

Third Judicial District, Bridgeport, October Term, 1913.
PRENTICE, C. J., THAYER, RORABACK, WHEELER and BEACH, Js.

The question whether a homicide is reduced from murder to manslaughter by the provocation arising from a previous combat between the parties, is to be determined from the particular circumstances of each case, including the nature of the act by which death was caused, the time which elapsed between the provocation and that act, and the conduct of the accused during that time. No definite period of time can be laid down by the court, as matter of law, within which one's passions must be held to have subsided and reason to have resumed its control. If, however, there was sufficient time for the anger of the accused to cool down before the homicide, the crime is murder, though his anger had not in fact subsided.

It is for the jury to determine the credibility of witnesses whose testimony is conflicting, and to render a verdict accordingly.

In the present case the account of the circumstances attending the homicide, as given by the accused, would have made it manslaughter, while the testimony of an apparently disinterested bystander tended to show that the crime was murder, and the jury returned

a verdict of guilty of murder in the second degree, which the trial court refused to set aside. *Held* that it was for the jury to pass upon the conflicting testimony and determine whether the crime was murder or manslaughter, and that it could not be said that their verdict was not warranted by the evidence.

Chapter 223 of the Public Acts of 1909, § 2, prescribes that before each jury term of the Superior Court the clerk shall draw from a suitable number of jury boxes, "in a manner to ensure a reasonable distribution of jurors among the several towns," the names of eighteen jurors, and § 663 of the General Statutes declares that the Superior Court "may at any time at its discretion order the drawing of a sufficient number of additional jurors to prevent the necessity of summoning talesmen." *Held* that the power of determining the locality from which jurors should be drawn was, by implication, vested in the presiding judge, and that his order to the clerk, when summoning additional jurors, not to draw any from the town in which the homicide was committed and the prisoner and his victim resided, was in the interest of justice and could not have been harmful to the accused.

The object of this law is to secure jurymen who will impartially hear the evidence and render a verdict thereon uninfluenced by extraneous circumstances.

Argued November 4th—decided December 20th, 1913.

INDICTMENT for murder in the first degree, brought to the Superior Court in New Haven County and tried to the jury before *Greene, J.;* verdict and judgment of guilty of murder in the second degree, and appeal by the accused. *No error.*

*Francis P. Guilfoile,* for the appellant (the accused).

*John P. Kellogg,* Assistant State's Attorney, for the appellee (the State).

RORABACK, J. The defendant was indicted for the crime of murder in the first degree upon the charge of having killed Camio Gerardi by stabbing him with a knife at Waterbury on the night of July 27th, 1912. He was found guilty of murder in the second degree by the verdict of a jury and sentenced to imprisonment for life.

That Gerardi died from the effect of wounds made by the defendant at the time and place set forth in the indictment, is not disputed.

One of the questions controverted was whether the elements necessary to constitute the crime of murder were sufficiently established by the evidence. The defendant contended that the evidence showed that no greater crime than manslaughter was committed.

The deceased was a carpenter, and worked for Tracy Brothers in Waterbury prior to his death. The defendant had been in the employ of the Chase Rolling Mill for about eleven years prior to July 1st, 1912. Upon the night in question the deceased and Rosa were in a saloon upon Spring Street in Waterbury. After playing cards together, and drinking more or less, they engaged in a personal encounter, in which Rosa's face was scratched by Gerardi, and the latter was knocked or pushed down by the accused. The two men were separated, and the deceased left or was put out of the saloon. He then started toward his home on the same street, and stopped to talk with a woman on the opposite side of the street from the saloon. Rosa remained in the saloon three or four minutes, when he left alone. As he left the saloon, the deceased was standing with the woman on the opposite side of the street facing him, about one hundred and fifty feet away. There was a conflict in the testimony as to what then occurred.

John J. Kelley, apparently a disinterested witness, testified that, when the deceased was talking with the woman, he saw Rosa come from the saloon and run across the street where Gerardi was standing. As Rosa passed the witness he put his hand in his hip pocket, pulled it out, and ran toward Gerardi and struck at him over his shoulder. Immediately after the blow the parties grappled with each other, and came across the street toward the witness, Rosa striking at

the deceased. Then Rosa threw the deceased in the gutter, struck at him while he was down, and, holding the knife at his throat, said something in a language not understood by the witness. At that moment Kelley ran and got hold of Rosa and pulled them apart, when he saw the top of a knife in Rosa's hand. As he pulled them apart Rosa struck again at the deceased with the knife, apparently cutting him on the chin. After he had separated them, Rosa remained a second or two, and then went back past the saloon and toward his own home, while Gerardi was assisted to his own house. The testimony of Kelley as to what occurred upon the street was contradicted in part by the defendant.

The defendant's version as to what occurred after he came out of the saloon was to the effect that he saw Gerardi talking with a woman; as he came near him he saw Gerardi have something in his hand, which he thought was a knife; he then put his hand in his pocket and drew out his knife; Rosa continued walking when he reached the spot where Gerardi was standing, when the deceased jumped into the street, and Rosa went toward him; they then went into the street when Gerardi struck him the first blow; then he took hold of him and struck him a blow with his knife in the back of his shoulder; when he struck him he also pushed him and he fell down; then Gerardi came up like a spring and rushed at him, and they clinched, when Rosa threw him upon the ground; when he had him upon the ground he told him to keep quiet, that he was not going to kill him; then two or three persons came up, and some one took hold of him and separated them, and he went home; that during all this time he was excited because of the disturbance in the saloon.

In discussing the question propounded, we are necessarily brought into contact with those principles of law which treat of "hot blood" when parties engage

in mutual combat, and whether or not a reasonable time had elapsed after the combat so as to reduce the crime from murder to manslaughter.

No precise time in hours and minutes can be laid down by the court as a rule of law, within which the passion must be held to have subsided and reason to have resumed its control. The question is one depending upon all the circumstances of the particular case. 2 Wharton on Criminal Law (7th Ed.) § 990.

The question is to be determined from the particular circumstances, having regard to the nature of the act by which death was caused, the time which elapsed between the provocation and the act, and the conduct of the accused during that time. The blow must not only have been inflicted while the accused was under the influence of the provocation, but it must have been inflicted at once. If there were sufficient time for his passion to cool, he is guilty of murder, though his passion has not in fact subsided. Clark on Criminal Law, p. 199. "In order to mitigate a homicide committed in a second combat by what occurred at a previous one, which had fairly begun on the sudden, both contests must be considered as making one combat, or the first, as a separate combat, must be considered as a sufficient sudden provocation for either a second combat, or for a subsequent attack producing a contest not entitled to be called a mutual combat. . . . Where one of the parties to a combat retires from it, goes some distance and arms himself, and returns and kills his adversary the act may be attributed to revenge, and not to provocation. And the rule is the same where sufficient time had transpired, not only for the deceased to adjust himself after the fight and walk deliberately 225 yards, but for the prisoner afterwards to pass over the same ground." Wharton on Homicide (3d Ed.) § 207, and cases cited.

If the evidence of Kelley were believed by the jury, it cannot be said that they were not justified in rendering a verdict of murder in the second degree. If the testimony of Rosa were credited by the jury, the case would have been an entirely different one, and it might have been found that the offense committed was that of manslaughter. The question of credibility of witnesses was one for the jury. They saw the witnesses, and heard them testify, and had an opportunity, from their appearance and manner of testifying, to know of their credibility. The jury were better qualified to pass upon the weight to be given to the testimony than this court, which has simply read the printed record of what they said. The defendant's version of the transaction apparently was discredited by the jury, and that given by Kelley has been adopted. The trial judge, who had an opportunity to see and hear all that occurred at the trial that might properly influence the jury, has expressed his satisfaction with the verdict by denying a motion to set it aside. We cannot say that he erred in reaching such a conclusion.

Prior to the trial a motion was made by the defendant to dismiss the entire panel of the jury because of the irregularity in drawing the same. The alleged irregularity consisted in the omission to draw jurors from the Waterbury jury box to the unlawful prejudice of the accused, in that it "deprives him of the opportunity to have included jurors from a town which includes a large portion of the population of New Haven county, and of which he was a resident. The omission to include jurors from the Waterbury jury list is to the unlawful prejudice of the accused, in that it might operate unfavorably to the defendant in the use of his peremptory challenge when the jury is being selected." This motion was denied, and this ruling was made a ground of appeal.

It appears that the regular panel of jurors for the September criminal term, 1912, at Waterbury, consisted of two from each of twelve different towns in New Haven county. The special panel drawn for the purpose of trying the case of State v. Rosa, consisted of two from every town in the county except Waterbury, where the defendant resided and where the homicide under investigation was committed. By order of *Judge Greene,* who presided at the September term of the criminal court, and who conducted the trial of the case against the defendant, the clerk of the Superior Court, in drawing jurors for the special panel, refrained from drawing jurors from the town of Waterbury to serve upon the special panel. The defendant contended that this action of the trial court was arbitrary and constituted a good cause for dismissing the panel.

General Statutes, § 660, as amended by § 2 of chapter 223 of the Public Acts of 1909, p. 1168, provides that "at some convenient time before each jury term of the superior court, court of common pleas, criminal court of common pleas, or district court of Waterbury, the respective clerks or assistant clerks of said courts shall publicly, and in the presence of any judge of any one of said courts and the sheriff in each county, or one of his deputies, draw from a suitable number of the jury boxes, in a manner to ensure a reasonable distribution among the several towns of jurors as drawn, the names of eighteen jurors, unless a larger number shall be ordered by the court or any judge thereof."

It is also provided, by § 663 of the General Statutes, that "the superior court, court of common pleas, criminal court of common pleas, or district court of Waterbury, may at any time, at its discretion, order the drawing of a sufficient number of additional jurors to prevent the necessity of summoning talesmen."

It will be noticed that the statute of 1909 relates to

the manner in which a regular panel of jurymen shall be drawn at some time prior to the commencement of a regular term of the court; while § 663 of the General Statutes provides that the court, in its discretion, may at any time order a special panel to avoid the necessity of summoning talesmen. The action of the court complained of in the present case was taken under § 663 of the General Statutes, and not under the provisions of the statute of 1909, as the defendant contended. Both statutes refer to the drawing of jurors; but neither of them indicate what authority shall determine from what locality the jury shall be selected. While neither of these expressly provides that the judge shall have the power of fixing the locality from which the jurors shall be taken, yet we think that such power is necessarily implied. In the absence of any provision in the statutes upon that subject, we know of no authority more appropriate to exercise this prerogative than the judge who is in charge of the court when the order is made. In the end that court alone exercises the function of passing upon the qualification of jurors, and the question as to the locality from which they are to be taken is merely an earlier stage of the same proceedings.

In the event of a controversy between the parties upon this subject the judge of the trial court would necessarily be called upon to settle the question. Under circumstances such as surround the present case, the selection of jurors from the inhabitants of the proper territory to act as jurors by the trial judge forms one branch of the business of the court, and it is in harmony with his authority to pass upon the question as to their qualifications before they are actually impaneled.

In *Moore* v. *Nation*, 80 Kan. 672, 685, 103 Pac. 107, 23 L. R. A. (N. S.) 1115, 1122, the court justified this exercise of judicial authority in the following language: "Whenever the statutory measures for obtaining petit

jurors have failed or have been exhausted the court itself issues an open venire and brings in a jury as a measure indispensable to the exercise of its jurisdiction." See also *Clawson* v. *United States*, 114 U. S. 477, 5 Sup. Ct. Rep. 949, 29 L. Ed. 179.

This case is not similar to *State* v. *McGee*, 80 Conn. 614, 69 Atl. 1059, where a deputy sheriff attempted to interfere with the plain statutory powers of a clerk of the court as to the manner in which the names should be drawn from the jury boxes.

The action of the trial judge in directing the clerk of the court in drawing the special panel to except the town of Waterbury, where the defendant resided and the homicide in question was committed, was well calculated to promote the ends of justice by getting rid of the prejudice which might have unjustly operated to the detriment of the rights of the State or to the rights of the defendant. The end sought by the law is to secure jurymen who will impartially hear the evidence and render a verdict thereon uninfluenced by extraneous circumstances. This order could not in any way have operated unjustly to injure the defendant. The jury was composed of men who were sworn to discharge their duties according to the law and the evidence before them.

There is no error.

In this opinion the other judges concurred.