Bentley Kassal, J.
This is a nonjury case. The defendant has been tried for the crime of murder in the second degree, *137 and there is no denial that he caused the death of Nilda Cruz, a 14-year-old girl.
ISSUE
The issue is whether the defendant is guilty of murder in the second degree as charged, or whether, as the defense contends, he acted under the "influence of extreme emotional disturbance,” an affirmative defense under section 125.25 (subd 1, par [a]) of the Penal Law, which, as a "mitigating circumstance,” would reduce the conviction to manslaughter, first degree.
(As with most cases where this defense may be properly asserted, the issue presented is a very close one since all intentional homicides, with the exception of those by coldblooded killers or in the course of a felony, are abnormal acts for the perpetrators and the result of strong emotions and stresses. Consequently, a distinction must be drawn so that this defense will only be applicable to those homicides which appropriately qualify under the underlying purpose of this mitigating defense and not en masse to all acts constituting murder, in the second degree.)
FACTS
The defendant made a complete confession, in great detail, of all the facts that covered a period from noon on April 17, 1975, until the actual killing, at about 6:30 that evening. The confession was first given in a statement dictated to a police detective at about 9:30 p.m., which defendant signed and he subsequently repeated a more elaborate report to an Assistant District Attorney at 2:20 a.m., in a question-answer session that was reported on tape as well as by a stenotypist. These two confessions are essentially consistent.
Approximately nine months later, he unraveled an entirely new story to a psychiatrist, retained by his attorney to testify at trial on the issue of whether he had been influenced by "extreme emotional disturbance.” He now maintains that only this new story represents the truth. Although he still does not deny having caused the death, the two stories differ in several critical areas, as set forth below. (There is no suggestion of any sexual activity or involvement from the defendant’s statements, the psychiatrists’ testimony or the medical examiner’s report.)
*138 (a) first set of confessions
The defendant, a narcotics counsellor at a public school, shortly after noon, smoked a couple of marijuana "joints” in his car with the deceased, who was then a truant from school. They drove around until she asked to buy some marijuana from him. Upon being refused, she threatened to report him which he felt would cause him to lose his job: "So she insisted that if I didn’t give her the reefer she’ll spread the word around that I got burn marks on my fingers and I’m dropping pills.” (Statement of Willard Shelton [hereafter "Statement”].) He tried to dissuade her. They drove and "rapped”. At about 6:00 p.m. when he found she was not being swayed, he parked in Highbridge Park, along the Harlem River Drive, and tied her hands in front of her with a piece of cloth he found there, finally dropped a large rock on her head, saw she was still alive and talking to him and dropped it a second time. He thereupon found an Afro-comb in the vicinity, removed one of the picks and, with a small rock, drove it several times into her larynx and chest. He then found a piece of auto stripping and began to stab her with this.
He left the body, drove away and was arrested as his car was parked alongside the Harlem River, with the engine running. He at first claimed an "alibi” and thereafter readily admitted all the circumstances.
(b) subsequent story
About nine months after the arrest, the defendant met with his psychiatrist-expert, Dr. Daniel W. Schwartz, and the story he then gave him differed significantly from the original confession.
Essentially, the points of distinction are these:
(1) When he met the deceased, she was on a street corner with a young man, about 20, "Angel”, and they joined defendant for a ride in his car. After they discovered a marijuana "roach” in his ashtray, "Angel” disclosed he was a member of the "Spanish-Mafia” and a narcotics pusher and Nilda Cruz was one of his peddlers in the school. Defendant warned "Angel” to stay out of the school with his drug activities. "Angel” threated defendant and his family. An argument ensued and defendant punched "Angel.” "Angel” jumped out of the car and disappeared.
(2) The entire afternoon was spent with Nilda Cruz leading *139 defendant on a fruitless search for "Angel” in the Bronx and upper Manhattan.
(3) After searching in vain, defendant accused her of giving him a "runaround” and they argued, with the defendant being concerned that she would tell her mother of the incident and whoever spoke to her mother first would be believed.
(4) They stopped at the same park, Nilda Cruz lashed at him with a small razor-blade knife, nicked him, and she jumped out of the car. (In this version he denied ever tying Nilda’s hands.)
(5) Nilda kept throwing rocks at defendant while he tried to evade them. Finally, he decided to get the knife out of her hand and stop her rock throwing. He picked up a 45-pound rock which he threw at her feet to knock her down. At that moment Nilda, who was about 15 feet away, bent over to get another rock and the rock thrown by the defendant hit her in the head.
(6) "Everything got silent in my ears after that” and it seemed to the defendant that he was back in Vietnam, with the enemy approaching. He then hit her with anything he could grab, including metal stripping from an auto and a steel prong from an Afro-pick.
(7) Realizing what he had done, he "got scared,” drove off, stopped along the river, started throwing rocks and was arrested.
(8) Defendant had no clear recollection of what happened after he hit Nilda with the rock.
(9) Defendant claims he was drugged by the police in the precinct station with something inserted in the coffee they gave him just before he made his first statement there. He further states that he had lied to his questioners and told them what he believed they wanted to hear.
DECISION AS TO CREDIBILITY
I am confronted with two versions of a homicide, but, as distinguished from "Rashomon,” both come from one and the same source. It is essential that there be a factual determination, ab initio, as to which version is credible since the original version spells out an intent to kill (which defendant seeks to have mitigated to manslaughter first degree on the basis of the claimed influence of "extreme emotional disturbance”). The subsequent story spells out no intent to kill, but *140 rather an accidental death, based on self-defense. In my judgment, the first set of confessions represents the truth, for the following reasons:
(1) The general demeanor of the defendant on the stand as he testified and repeated the same version he gave to Dr. Schwartz demonstrated a complete lack of candor and credibility in the manner which he answered questions, the illogic of his tale, inconsistencies, and obvious falsifications of testimony.
(2) There was an independent witness at the trial, a man who happened to have been taking his usual walk in the park, who testified that he saw defendant talking to Nilda Cruz. He unequivocally stated that her hands were then bound in front of her and that she kept shaking her head vigorously as defendant spoke to her. It was this witness, whose suspicions were aroused by the bound hands, who called the police to the scene as a result of his fears from these observations. He was a disinterested witness, and was entirely credible. His testimony, in significant measure, confirms the original confession in which the defendant conceded he had bound Hilda’s hands. In the subsequent story, he denied having done this.
(3) The tape of the original confession, which was made within eight hours of the event evinced a complete comprehension and recollection on defendant’s part. It presents a very calm, lucid and detached recital in detail of all the facts of the day, leading up to the first actual confession to the detective four hours later and to the taped confession to the assistant district attorney eight hours after the killing.
(4) Defendant’s own expert, Dr. Schwartz, having reviewed the autopsy report, and the dictated and signed statement and having listened to the question and answer taped confession, compared them to the second version directly given to him by the defendant. He classified the latter story as "retrospective falsification”, and testified that this has its origin in extreme guilt feelings and is a subconscious attempt to justify the act so as to make its memory more bearable.
(5) Dr. John Train, the expert psychiatric witness called by the People, reviewed the statements, the tape recording, Dr. Schwartz’s report, a copy of the autopsy report, the photographs, and defendant’s board of education employment records and concludes: "This second version is not a change in memory due to a time lapse but is rather a self-serving *141 elaborate falsification to make it appear he acted in self defense.” (Report of Dr. John Baer Train.)
PERTINENT STATUTE
Section 125.25 of the Penal Law provides that:
"A person is guilty of murder in the second degree when:
"1. With intent to cause the death of another person, he causes the death of such person * * * except that in any prosecution under this subdivision, it is an affirmative defense that:
"(a) The defendant acted under the inñuence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant’s situation under the circumstances as the defendant believed them to be” (emphasis added).
This section was enacted as part of the revised Penal Law in 1965 and is sui generis in that the defense is only applicable to the one crime, murder, second degree.
EVALUATION OF "EXTREME EMOTIONAL DISTURBANCE” IN
CASE AT BAR
Having made the initial factual determination that defendant did cause the death of Nilda Cruz, with intent to do so (see Decision as to Credibility, supra), thereby spelling out all the requisite elements for murder in the second degree, the next critical issue to be confronted is the applicability of the statutory defense to the facts. Among the factors considered in this regard (and discussed at length below) are these: statutory construction of the defense of extreme emotional disturbance; admissibility of expert psychiatric testimony; the psychiatric testimony (including the opinions regarding extreme emotional disturbances and definitions of same); the role of affect; definition of extreme emotional disturbance; findings of fact; conclusions of law.
STATUTORY CONSTRUCTION
(a) LEGISLATIVE INTENT
The Commission Staff Notes of the Staff of the State Commission on the Revision of the Penal Law and Criminal Code (Gilbert, Criminal Law and Procedure of New York [1975], pp *142 2A-1, 2A-61-62) offer only the following as an explanation of "extreme emotional disturbance”: "[T]he phrase 'in the heat of passion,’ is abandoned as the criterion of mitigation in favor of the phrase, 'under the influence of extreme emotional disturbance for which there is a reasonable explanation or excuse.’ This standard, adopted from the equivalent manslaughter provision of the Model Penal Code [§ 210.3(b)], is, in the Commission’s opinion, superior to 'heat of passion’ and other traditional criteria from the standpoints of both logic and general fairness (see Model Penal Code Commentary, Tentative Draft No. 9, pp. 28-29).”
The Comments to the Model Penal Code, from which the present New York provisions are derived, provide some further explanation of this defense. (Model Penal Code, § 201.3, Comment [Tent. Draft No. 9 (1959)] [hereafter "Comment”].) The defense, as there described has two principal elements: (1) the defendant’s act must be committed "under the influence of extreme emotional disturbance”; and, (2) there must be "a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant’s situation under the circumstances as the defendant believed them to be.”
While great attention is paid to the second element, the Comment appears to assume that the first is almost self-explanatory. The Comment offers "fright or terror” as two examples of such disturbance and at times appears to equate it with "the 'heat of passion’ of the common law.” (Comment, p 46.) It speaks of "great distress” (Comment, p 46) or where the actor has "just suffered a traumatic injury” or was "blind or * * * distraught with grief.” (Comment, p 48), but offers no further quantitative or qualitative definition of the term.
As to the second element, the cause of the disturbance, the formulation "sweeps away the rigid rules that have developed with respect to the sufficiency of particular types of provocation” and "avoids a merely arbitrary limitation on the nature of the antecedent circumstances that may justify a mitigation” (Comment, p 46). By the introduction of the new test of "reasonableness” the draftsmen sought to "introduce a larger element of subjectivity in the appraisal [of the causative event] though it is only the actor’s 'situation’ and 'the circumstances as he believes them to be, not his scheme of moral values, that are thus to be considered.” (Comment, p 41.)
After stating that the element of subjectivity has been *143 enlarged the draftsmen take the somewhat contradictory position that: "The ultimate test, however, is objective; there must be 'a reasonable’ explanation or excuse for the actor’s disturbance. This is, we think, to state in fair and realistic terms the criteria by which men do and should appraise the mitigating import of mental or emotional distress when it is a factor in so grave a crime as homicide”. (Comment, p 41.)
Clearly the test of the reasonableness of the cause cannot be completely objective, for the model on which we fashion many of our legal standards, the "reasonable man,” "quite plainly does not kill.” (Comment, p 47.) The subjective aspect of the test is therefore injected to "offer room for argument as to the reasonableness of the explanations or excuses offered.” (Comment, p 48.)
It would be impossible to describe the explanations offered by the comments as setting precise guidelines to aid the trier of the facts, nor do they even attempt to do so. As the draftsmen state, after discussing the various standards they have rejected: "The question in the end will be whether the actor’s loss of self-control can be understood in terms that arouse sympathy enough to call for mitigation in the sentence. That seems to be the issue to be faced.” (Comment, p 48.)
This view is echoed by Professor Herbert Wechsler, Chief Reporter for the Model Penal Code; "The purpose was explicitly to give full scope to what amounts to a plea in mitigation based upon a mental or emotional trauma of significant dimensions, with the jury asked to show whatever empathy it can.” (Wechsler, Codification of Criminal Law in the United States: The Model Penal Code, 68 Col L Rev 1425, 1446.)
However laudatory these goals are, they ignore, to some degree, the realities of the courtroom. A jury must be instructed as to the material legal principles applicable to the facts presented in a case. (CPL 300.10, subd 2.) Nor have I found jurors hesitant in asking for clarification where there is a lack of understanding or some abiguity in the court’s charge.
In my role as trier of the facts in this case, I have been required, in effect, to assume the jury’s role and ask myself what is meant by this defense. In so doing, I am drawn to the words of Mr. Justice Cardozo, describing a former provision and which is quoted by the majority in People v Patterson (39 NY2d 288, 300 [hereafter "Patterson”]): "'What we have is merely a privilege offered to the jury to find the lesser degree *144 when the suddenness of the intent, the vehemence of the passion, seems to call irresistibly for the exercise of mercy. I have no objection to giving them this dispensing power, but it should be given to them directly and not in a mystifying cloud of words.’ (Cardozo, Law and Literature, pp. 100-101)”.
In reviewing the present provisions, I must agree with Professor Robert M. Byrn, who concludes that: "All that has happened in that one 'mystifying cloud of words’ has been substituted for another.” (Byrn, Homicide Under the Proposed New York Penal Law, 33 Fordham L Rev 173, 179.)
(b) judicial interpretation
There is an apparent dearth of judicial construction of the language of this defense in spite of the fact that the mitigation formulation proposed in the Model Penal Code has been enacted or adopted, in varying forms, in at least nine jurisdictions other than New York. (See Conn GSA, § 53a-54, subd [a], par [1]; Del Code Ann, tit 11, § 641; Hawaii Penal Code, § 702, subd [2]; Ky Rev Stat, § 507.020, subd [1], par [a]; Rev Codes of Mont, § 94-5-103; N Dak Century Code, § 12.1-16-02; Ore Rev Stat, § 163.115; Utah Code Ann, § 76-5-205.) A review of the annotated statutes for these States reveals no judicial construction of the terms nor does the commentary with respect to the various statutes do more than repeat the language of the comments to the code.
In fact, it appears that the only significant judicial interpretation of this defense is that provided by our Court of Appeals in the recent Patterson decision where the majority states: "In Ne„w York, the prosecution is at all times required to prove, beyond a reasonable doubt, the facts bearing the defendant’s intent. That the defendant acted because of an extreme emotional disturbance does not negate intent. The influence of an extreme emotional disturbance explains the defendant’s intentional action, but does not make the action any less intentional. The purpose of the extreme emotional disturbance defense is to permit the defendant to show that his actions were caused by a mental infirmity not arising to the level of insanity, and that he is less culpable for having committed them * * * The opportunity opened for mitigation differs significantly from the traditional heat of passion defense. Traditionally, an action taken under the heat of passion meant that the defendant had been provoked to the point that *145 his 'hot blood’ prevented him from reflecting his actions * * * Furthermore, the action had to be immediate, for if there was time for 'cooling off, there could be no heat of passion * * * An action influenced by an extreme emotional disturbance is not one that is necessarily so spontaneously undertaken. Rather, it may be that a significant mental trauma has affected a defendant’s mind for a substantial period of time, simmering in the unknowing subconscious and then inexplicably coming to the fore. The differences between the present New York statute and its predecessor * * * can be explained by the tremendous advances made in psychology since 1881 and a willingness on the part of the courts, legislators, and the public to reduce the level of responsibility imposed on those whose capacity has been diminished by mental trauma. It is consistent with modern criminological thought to reduce the defendant’s criminal liability upon proof of mitigating circumstances which render his. conduct less blameworthy.” (Patterson, supra, pp 302-303; citations omitted.)
Finally, reference to various form books, containing instructions to jury, such as Dowsey, Charges to the Jury and Requests to Charge in a Criminal Case in New York (form No. 107 [1975]), and the "prototype charge” from the Handbook of Jury Trial Procedure and Charges issued for the Supreme Court of the State of New York, Criminal Branch, First Judicial District (Dec., 1973), reveals adequate explanation of the effect of this provision as an affirmative defense, but presents virtually no definition of "extreme emotional disturbance.”
ADMISSIBILITY OF EXPERT PSYCHIATRIC TESTIMONY
While there has been some confusion as to whether psychiatric testimony is admissible on the issue of "extreme emotional disturbance” (see, e.g., ruling in People v Chi Yung Lau, NY County, Indictment No. 3214-74, denying admissibility) the language of Patterson at least implies that such testimony is relevant and material and not otherwise inadmissible (Justice Rosenberger's opinion in People v Williams, NYLJ, May 5, 1976, p 8, col 6, provides a thorough discussion of this issue). This is not to say that such testimony is essential or controlling, and the trier of fact may reject the defense even where the prosecution offers no expert testimony to rebut it. (People v Solari, 43 AD2d 610, affd 35 NY2d 876; Patterson, supra, p 304.)
*146 PSYCHIATRIC TESTIMONY REGARDING EXTREME EMOTIONAL DISTURBANCE HEREIN
In this case each side presented expert psychiatric testimony. While the two experts agreed as to many of the factual bases for their conclusions, the conclusions themselves were diametrically opposed. Therefore, such testimony, while helpful in highlighting issues is not dispositive. The court must first determine a definition of the defense, based on the statutory construction already discussed and the definitions offered by the psychiatrists, and by applying this definition to the facts presented, reach its verdict.
PSYCHIATRIC DEFINITION
In order to arrive at a definition of "extreme emotional disturbance” to apply to the defendant’s actions in this case, I asked both forensic psychiatrists to state their understanding of the term. (Both are very experienced witnesses who have given expert testimony in hundreds of cases.)
They agreed that this term is a creature of law and has no diagnostic classification in the glossary of the Diagnostic and Statistical Manual of the American Psychiatric Association.[1]
(a) dr. train’s definition:
It is a psychiatric classification of a transitional, situational reaction in which an individual with no apparent mental *147 disorder, when exposed to an extreme, unusual, overwhelming stress has an extreme emotional reaction to it, which may result in a sudden, impulsive, blind, irrational outburst. During this reaction there is such a release of emotion that when it is over, the person is totally spent. It is not deliberate or intentional. (It should be noted that the mental state required by the statutory defense does not necessarily make the action any less intentional, but rather explains the intentional action, thereby making it less culpable. [See Patterson, 39 NY2d 288, 302, supra].)
(b) dr. schwartz’s definition:
Extreme, emotional distress is an emotional condition where a person is directed by passion, rather than by reason. One’s passions, excited beyond intellectual control, take over. Rage is then the predominant feature. The normal pattern would be to experience rage first, followed shortly thereafter by intense regret and self-criticism "for having done such a stupid thing,” and after that, there would be emotional exhaustion.
In general, it was agreed that a person’s self-control and reason would be overwhelmed by passion, anger and other feelings. The feelings are so intense that the usual controls fail and normal rational thinking for that individual no longer prevails at that moment. There is no time interval between the provocation and the act, and if there is time to reflect, with a cooling-off period for deliberation, this would be antithetical and diametrically opposed to extreme emotional disturbance. (While this last element fairly states one of the requirements for "heat of passion” under the prior law, "[a]n action influenced by an extreme emotional disturbance is not one that is necessarily so spontaneously undertaken.” [Patterson, supra, p 303].)
Dr. Train defined extreme as the "furthest distance from the norm that can be expected. It is at the extreme end of any kind of bell curve.” Dr. Schwartz stated that he was unable to draw a definitive line between "extreme”, "severe”, "moderate” and "mild” since it was not measurable as with mental defects.
AFFECT
(a) ROLE OF "affect”
Great emphasis was placed by the prosecution on the "af *148 feet” the defendant exhibited in the question and answer tape as evidence of his emotional state at the time of the homicide.
The psychiatrists agreed, in substance, that "affect” deals with the observable characteristics of an individual’s mood which are displayed in his facial expressions, gestures, body movements, tone of voice and manner of speech. Dr. Train stated that a person who had acted under the influence of extreme emotional disturbance would be apathetic, withdrawn, dull, exhausted and depressed about what had happened and would speak in a monotone, giving short direct answers. He would not be productive. He would offer nothing more than simple sentences with short direct answers and one would be able to hear the monotone of his voice, indicating the effect of depression and emotional lethargy in the sense that all emotional energy had been spent and drained. This reaction would last for some time until there had been a period of sleep.
Dr. Schwartz agreed generally with the above definition and stated that "affect” might have considerable bearing on the total psychiatric assessment of a person and be significant in the determination as to whether he was under influence of extreme emotional disturbance. "Affect” after rage would first be regret, followed by self-criticism and then exhaustion.
(b) tape recording and "affect”
Both experts agreed that the tape was important in the determination of affect and extreme emotional disturbance, when coupled with all the objective facts. Dr. Train stated the sound of defendant’s voice and content as set forth in the recording a few hours after the offense were inconsistent with such claim of extreme emotional disturbance. There was no unusual excitement nor did he speak in the slow monotone of depression. He spoke directly, coherently, relevantly and productively. He was candid, expressed no guile and was very matter of fact.
Dr. Schwartz did not recall defendant’s affect nor did he note it in his report or in his memory, but he agreed that if there had been such critical influence, it would be reasonable to find emotional drain some hours after the event. He declined to state how long this feeling of exhaustion or drain would necessarily last, holding that there was no time graph for an evaluation that would apply uniformly to all people.
*149 Dr. Schwartz also stated that in his interview with defendant, nine months after the crime, he was told that after he killed her, he got "scared” and drove off and then started to feel "funny”. He never said he felt any of these feelings during the killing — these were emotional reactions after the act.
Having listened with great attention to the original tape recording, I was most impressed with the cool, deliberate matter-of-fact manner in which the defendant described in a very orderly and detailed manner all aspects of the act, including the dropping of the rock, the fact that the deceased was still alive and her words to him, the second dropping of the rock on her head, the driving of the pick with a stone into her vital parts, and the final stabbing with the metal stripping. It was all recited in a very casual and objective manner, as if one were telling or reading a story.
It is significant that the defendant’s voice, tone and manner in testifying on the tape was the same as that when testifying at trial.
DEFINITION OF EXTREME EMOTIONAL DISTURBANCE
In determining the applicability of this defense to the facts here presented, I have assumed that extreme emotional disturbance is the emotional state of an individual, who: (a) has no mental disease or defect that rises to the level established by section 30.05 of the Penal Law; and (b) is exposed to an extremely unusual and overwhelming stress; and (c) has an extreme emotional reaction to it, as a result of which there is a loss of self-control and reason is overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation, or other similar emotions. In evaluating this, consideration is given to whether the actor is able to reflect dispassionately, the time interval between the provocation and the act and whether the intensity of these feelings is such that his usual intellectual controls fail and the normal rational thinking for that individual no longer prevail at the time of the act. Perhaps the key factor in this determination is the loss of self-control.
The term "extreme” refers to the greatest degree of intensity away from the norm for that individual.
In order to qualify for this mitigating defense I believe that all three elements must be found.
*150 FINDINGS OF FACT REGARDING "EXTREME EMOTIONAL disturbance”
I find as follows:
(a) The defendant had no mental disease or defect, as deñned by section 30.05 of the Penal Law, at the time of such conduct.
Both psychiatrists came to this conclusion and I join them in this respect.
(b) Although the defendant was exposed to an unusual stress, the People have established that it was neither extremely unusual nor overwhelming.
The stress asserted here was that Nilda Cruz threatened to tell his superiors that defendant, a narcotics counsellor, used marijuana and consequently, he might lose his position, which concededly was of importance to him in terms of status and money. On the other hand, it was proved that the defendant, as he described himself, had always been very "cool” and in the last analysis, he knew it was his word against hers, a 14-year-old student.
This does not spell out such an extreme and unusual stress to account for his reactions.
(c) The defendant had no loss of self control.
All the circumstances of the crime militate against the conclusion that he lost his self control:
(i) There was a period of at least 4 to 5 hours that he was aware of Nilda Cruz’s threat to report him. The parties drove around and "rapped,” with the defendant trying to dissuade her from reporting him.
The following statements by defendant support this conclusion. (The emphasized language represents those portions of great significance in this determination. Citations are to the Statement, supra):
"[W]e start rapping, rapping, rapping * * * for a long time. Driving up and down trying to convince her. She just wouldn’t go for it.”
(She then took a swipe at him with a small knife which he took away.)
"We just drove, arguing, arguing arguing, right.”
"It’s not really anger * * * you can call it anger. Just something that you want to try and convince the kid * * * about * * * that smoking and trying to spread rumors about *151 saying I’m dropping pills and all these things * * * I strived too hard to get this little * * * spot where lam today. ”
"I pulled off the highway * * * It could be seen but it’s off enough where it’s not a noticeable * * * And then * * * I still rapped. We sit down for a little while * * * So she said well, I don’t care but somebody is going to find out what’s happening
* * * And from there I said well, you’re not going to squeal on me. So I tied her hands up with a rag and then she start copping a plea añer that. ”
"She walked with me * * * We were sitting down * * * And then from there we start still rapping about the same thing. And then after I tie her up, she going to break out
* * * like a cop plea, begging * * * like 'I’m not going to tell now’ * * * because she thought I was going to do something to her * * * just rapping. We were just rapping about * * * the same thing over and over again. See I’m trying to see if she can convince me that everything is cool, but it seemed like she wasn’t going to come out that bad.”
"Then from there we sitting out like this, I pushed her over and before she could * * * get up I threw the rock * * * on her head * * * Then it seemed like she still wasn’t * * * through, so I took * * * an Afro comb. I said well maybe I can
* * * hit certain spots with it* * * and all that stuff. I pulled one of the steel things out of the comb, took a rock and start hitting the rock on the steel prong, * * * seemed like that wouldn’t work * * * it go all the way in because * * * it’s straight and sharp and very ñne. So, it seemed like that couldn’t work so I took another metal object and then tried to stick her with that * * * in the chest area and the neck. Yes, and the head * * * That was it. Then I drove off.” (After defendant dropped the rock once, Nilda Cruz appeared to him to still be alive.) "She was still moving, and she said T’m going to get you. ’***]' know she was going to do that all the time.”(He then dropped the rock a second time.)
"I was just pounding * * * in a rage * * * trying to get it over with, get out of there.”
"It wasn’t intentionally (trying to kill her) but that’s how it worked out. It wasn’t planned that way but that’s how it worked out. If somebody put you in a bind and you know, you’re going to blow your job, no telling when you’re going to get any more money anytime soon. Maybe you might try, if you think you can get away with it * * * I had to do some *152 thing to ñnish her off because she won’t bear witness against me.”
"I didn’t really want to [finish her oil] but I know it was just me or her. ”
(Defendant stated he wasn’t sure if Nilda Cruz was dead when he left. He was then asked if she moved.)
"No. Like you can see her tongue * * * but I said well that’s enough. If she is not dead I’ll have to forget it * * * And after that I backed up * * * I took the rag off ñrst, okay * * * As I was backing up, I threw the rag out.”
(ii) The disinterested witness, who observed them but moments before the killing, testified that defendant had bound her hands and was talking to her, apparently still trying to convince her at that point, while she refused to change her mind.
(iii) The manner in which the homicide took place was also important: the calm decision to kill her; the 45-pound rock being dropped on the girl’s head once; the defendant’s observation that she was still alive and would "get him”; the second dropping of the same rock; the use of a pick and another rock as a hammer in repeated attempts to strike other vital parts such as the neck and chest.
(iv) A further important criteria in aiding the court in this evaluation was defendant’s "affect” as demonstrated by the tape recording and supported by psychiatric testimony, which I credit.
(v) Although this was an unusual reaction for defendant, he was too contrived and calculating in his actions to find that he lost control.
The defendant’s conduct and statements do not demonstrate the influence of extreme emotional disturbance as I have analyzed this term (see Definition of Extreme Emotional Disturbance, supra) and I conclude that he was not acting under such influence at the time of the homicide. Since the second element of the defense, as prescribed by section 125.25 of the Penal Law, the reasonableness of the excuse or explanation, presumes a finding of extreme emotional disturbance, that element is not reached here.[2]
*153 BURDEN OF PROOF
The Penal Law designates this defense as an affirmative defense, placing the burden upon the defense to establish this by a preponderance of the credible evidence (Penal Law, §§ 125.25, 25.00, subd 2). The Court of Appeals has only recently upheld the constitutionality of this burden distinguishing that ruling from the decision of the Supreme Court of the United States in Mullaney v Wilbur (421 US 684), which held that a Maine statute, with similar objectives, was unconstitutional (Patterson, 39 NY2d 288, supra). In spite of this, the Assistant District Attorney has stated that it is the policy of the District Attorney for New York County to treat this as an ordinary defense and has requested the court to place the burden on the People to disprove the defense beyond a reasonable doubt.
However much I may agree with the prosecutor’s analysis of the decisions in Mullaney v Wilbur (supra), and Patterson (supra), I would be bound by the decision of this State’s highest court until the Supreme Court had an opportunity to clarify this issue or further action was taken by the Court of Appeals. The resolution of this case does not require that I enter the waters muddied by Mullaney v Wilbur and Patterson. Under the facts here presented I find that the prosecution has met the higher burden of disproving the defense beyond a reasonable doubt.
CONCLUSIONS OF LAW
I find the defendant guilty of the crime of murder, second degree, as charged in the indictment in that he intended to cause the death of Nilda Cruz and he did cause her death. I am also satisfied beyond a reasonable doubt that in doing so, he did not act under the influence of extreme emotional disturbance which would have reduced the crime to manslaughter, in the first degree.
This constitutes the judgment of this court. The case is adjourned July 21, 1976, for sentencing.

. After reaching my decision in this case, I had the opportunity to discuss this issue with Dr. Edward J. Sachar, Chairman of the Department of Psychiatry of Albert Einstein College of Medicine. I agree with his conclusion that "extreme emotional disturbance” as used in the statute falls within the category of "transient situational disturbances” in the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association (DSM-11 Category 307). The category includes "more or less transient disorders of any severity (including those of psychotic proportions) that occur in individuals without any apparent underlying mental disorders and that represent an acute reaction to overwhelming environmental stress.” Such symptoms would usually recede after the stress is diminished or removed.
Examples given of such reactions in adults include fear associated with military combat and manifested by trembling, running and hiding or bizarre behavior exhibited by a prisoner awaiting execution.
Thus extreme emotional disturbance would be at the highest end of this category, but short of a continuing psychotic reaction associated with underlying mental disorders.
This category is presently under revision, and will appear in the next edition of the manual under "Stress Disorder, nonpsychotic type”. Hopefully the new definition may be even more helpful as a model against which such behavior can be measured.

. While, as a consequence of the foregoing determination, it is unnecessary to address this issue herein, it is to be noted that both psychiatrists testified that the defendant’s reaction to the underlying situation was unreasonable (at the very least, under objective criteria), though they both felt that this was properly a legal-factual
*153 rather than psychiatric issue. It is an interesting commentary on the confusion resulting from the objective/subjective test of reasonableness that each expert felt that the unreasonable reaction supported his conclusion — on the one hand that defendant’s conduct was influenced by extreme emotional disturbance and, on the other that it was not the product of such disturbance.