STATE OF CONNECTICUT *v.* ROBERT L. ELLIOTT

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

Argued November 15, 1978—decision released March 6, 1979

*George N. Thim,* assistant public defender, with whom, on the brief, was *Thomas J. Ullman,* law student intern, for the appellant (defendant).

*Eugene J. Callahan,* assistant state's attorney, with whom, on the brief, was *Donald A. Browne,* state's attorney, for the appellee (state).

1

LOISELLE, J. The defendant, Robert L. Elliott, was indicted by a grand jury for the crime of murder in violation of § 53a-54a of the General Statutes. A jury found him guilty as charged. The defendant was sentenced to not less than twenty-five years to life imprisonment and from that judgment he has appealed.

From the testimony, the jury could have found that on the morning of June 22, 1976, the defendant, armed with a loaded revolver, went to the home of his brother, the victim in this case. After failing to gain entrance to the dwelling at the front door, he forced his way in through the kitchen door. Once inside, he threatened his ten-year-old niece with a gun, forcing her to tell him that his brother was upstairs in bed. On the stairs, Elliott encountered his brother's wife. When she saw the defendant she ran down the hallway to the back door. Elliott pursued her down the hall pointing a gun at her. Mrs. Elliott's path was blocked by a hobbyhorse. She turned and saw that the defendant was only a few feet away from her. She then saw her husband come up from behind the defendant. He called out "Bobby." The defendant then turned around and shot him twice in rapid succession. The defendant said nothing during this whole episode. The victim died from the gunshot wounds. The defendant was apprehended shortly after the shooting about one half mile away from his brother's house.

After he was apprehended, Elliott was brought to police headquarters and booked. He gave a written statement to the police detailing the events of that morning. The booking police officer testified that the defendant was calm and able to comprehend

and answer questions. The officer described Elliott's emotional state at the time of the arrest and interrogation as normal.

The defendant offered into evidence the testimony of a psychiatrist who interviewed the defendant about eleven months after the shooting. The psychiatrist testified that the defendant, at the time of the shooting, was acting under the influence of an extreme emotional disturbance caused by a combination of child custody problems, the inability to maintain a recently purchased home and an overwhelming fear of his brother. The psychiatrist placed particular emphasis on the history of conflict between the two brothers, noting that the defendant referred to his brother as a "ranger killer." The defendant told the psychiatrist that at one time his brother pulled him from a bus and chased him with a tire iron. The defendant stated that this incident was so frightening that it caused him to leave the area for a couple of years. The psychiatrist believed that this incident compounded by many other extenuating circumstances resulted in the defendant's overwhelming fear of his brother. And he testified that these circumstances taken together constituted a reasonable explanation of the defendant's extreme emotional disturbance.

The defendant's one assignment of error is that the trial court erred in its charge on the defense of extreme emotional disturbance, contained in General Statutes § 53a-54a (a).[1] We agree. In explain-

---

[1] "[General Statutes] Sec. 53a-54a. MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative

ing the meaning of "extreme emotional disturbance," the court actually gave the substance of the traditional charge on the "heat of passion" defense, which existed prior to the enactment of the present Penal Code.[2] The defenses of extreme emotional disturbance and heat of passion are not interchangeable.

The extreme emotional disturbance defense outlined in General Statutes § 53a-54a (a) is the same as the affirmative defense that appears in the New

defense that the defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[2] In its charge, the court said: "What does extreme emotional disturbance mean? It means a sudden frenzy of passion of the slayer, inflamed by some provoking cause, that naturally might be expected to carry, for the moment, a reasonable man beyond the bounds of self-control. That is, a man may be suddenly and grossly insulted or provoked or confronted with an unexpected situation with such gross or ostensible indignity to his feelings that what he does under the first hot spur of impulse and indignity is to be weighed and considered in the law with a human reference to the provocation under which he acted as a result of it.

The indignity, charge, insult or whatever it may be that provoked the impulse or passion must be sudden, unanticipated and so gross and overpowering in its character as to wipe out or away all sane self-control, and for the time being, carry the man dominated by it beyond willpower and all reason and restraint.

A trivial provocation such as words or an insult will not in itself form the basis for a claim of extreme emotional disturbance. Only when the wrong done is so outrageous in its nature that it arouses anger, fear, terror or other emotions to such an extent that self-control is overcome may it be termed an extreme emotional disturbance.

Moreover, if after the provocation the blood of the man subjected to it has had time to cool, or if the killing in fact was not due solely to the extreme emotional disturbance but was, in whole or

York murder statute.[3] The fact that a statute is almost a literal copy of a statute of a sister state is persuasive evidence of a practical reenactment of the statute of the sister state; as such it is proper to resort to the decisions of a sister court construing that statutory language. See *Witherspoon* v. *Salm,* 251 Ind. 575, 243 N.E.2d 876 (1969); 82 C.J.S., Statutes § 371; 73 Am. Jur. 2d, Statutes § 166; see also *People* v. *Connolly,* 36 Cal. App. 3d 379, 111 Cal. Rptr. 409 (1973).

Construing the New York statute, the United States Supreme Court upheld the designation of

in part, actuated by something else, such as hatred, or desire for vengeance, et cetera, then extreme emotional disturbance cannot be said to have caused the action of the man. So if before provocation, a purpose to kill had been formed in the mind of the person which in whole or in part actuated the crime or if the emotion aroused by the provocation had so far spent itself that the person doing the killing had time to make a rational choice of to kill or not to kill, then, again, the extreme emotional disturbance cannot be said to have caused the action of the man.

There is something else that I must point out when you are considering this issue. The exception to murder, by its terms, requires that the accused act under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse. The word reasonable is important. Under our law the reasonableness of that explanation or excuse is to be determined from the viewpoint of a person in the accused's situation under the circumstances as the accused believed them to be."

[3] N.Y. Penal Law § 125.25, subdivision 1 (a) (McKinney 1975): "MURDER IN THE SECOND DEGREE. A person is guilty of murder in the second degree when: 1. With intent to cause the death of another person, he causes the death of such person or of a third person; except that in any prosecution under this subdivision, it is an affirmative defense that: (a) The defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be. Nothing contained in this paragraph shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

extreme emotional disturbance as an affirmative defense and the placing of the burden of proof upon the defendant in *Patterson* v. *New York,* 432 U.S. 197, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977). In the present case, however, which was decided prior to the Supreme Court's ruling in *Patterson,* the trial court charged that the state had the burden of proving the nonexistence of the defense. In charging this way, the trial court was, no doubt, trying to conform to the dictates of *Mullaney* v. *Wilbur,* 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975), and *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). These cases were distinguished in *Patterson,* supra, and the Supreme Court went on to hold that the defense of extreme emotional disturbance was not constitutionally infirmed even though the burden of proof was placed on the defendant.

The United States Supreme Court's reasoning for allowing the burden of proof to be placed upon the defendant was that the defense of extreme emotional disturbance does not serve to negate intent, but rather is raised to establish circumstances that mitigate culpability. "The influence of an extreme emotional disturbance explains the defendant's intentional action, but does not make the action any less intentional. The purpose of the extreme emotional disturbance defense is to permit the defendant to show that his actions were caused by a mental infirmity not arising to the level of insanity, and that he is less culpable for having committed them." *People* v. *Patterson,* 39 N.Y.2d 288, 302, 347 N.E.2d 898 (1976).

In *Patterson* v. *New York,* the United States Supreme Court noted that the defense of extreme

emotional disturbance is a considerably expanded version of the common law defense of heat of passion or sudden provocation.

It is evident from a reading of § 53a-54a (a) that the defense does not require a provoking or triggering event; or that the homicidal act occur immediately after the cause or causes of the defendant's extreme emotional disturbance; or that the defendant have lost all ability to reason. Further, the reasonable man yardstick is only used to determine the reasonableness of the explanation or excuse of the action of the defendant from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be. Thus, the statute sets forth a standard that is objective in its overview, but subjective as to the defendant's belief.[4]

Before the enactment of the present Penal Code in this state, to establish the "heat of passion" defense a defendant had to prove that the "hot blood" had not had time to "cool off" at the time of the killing. *State* v. *Rosa,* 87 Conn. 585, 89 A. 163 (1913). A homicide influenced by an extreme emotional disturbance, in contrast, is not one which is necessarily committed in the "hot blood" stage, but rather one

---

[4] It is noteworthy that in 1876, in the case of *Andersen* v. *State,* 43 Conn. 514, 527, this court, by a majority opinion, recognized that an emotional disturbance, which it described in other terms, as distinguished from "heat of passion" could be a mitigating circumstance in a homicide case when it stated: "May it not be possible that the man's unfortunate temper, excited by what he regarded as repeated and successive provocations, held all his faculties, moral and intellectual, in subjection to some extent, so that he was incapable of reasoning correctly, or rightly apprehending his relations to others? And that too, not only while he was under the direct and immediate influence of the exciting causes, but also after he had had time and opportunity for reflection, continuing even until after the commission of the homicide?"

that was brought about by a significant mental trauma that caused the defendant to brood for a long period of time and then react violently, seemingly without provocation.

General Statutes § 53a-54a is based on the Model Penal Code of the American Law Institute, Tentative Draft No. 9, § 201.3, on manslaughter. The comments accompanying the Model Penal Code attempt to explain the change from the old common law concept of killing in the "heat of passion" to the new concept of killing under the influence of an "extreme emotional disturbance." The comments seem to be contradictory in that they claim the ultimate test is objective yet the state of mind of the accused is to be evaluated from his viewpoint under the circumstances as he believes them to be. In the draft, there are no attempts to set guidelines to aid the trier of fact. The draftsmen state: "The question in the end will be whether the actor's loss of self-control can be understood in terms that arouse sympathy enough to call for mitigation in the sentence. That seems to be the issue to be faced." The Chief Reporter for the Model Penal Code has noted that "[t]he purpose was explicitly to give full scope to what amounts to a plea in mitigation based upon a mental or emotional trauma of significant dimensions, with the jury asked to show whatever empathy it can." Wechsler, "Codification of Criminal Law in the United States; The Model Penal Code," 68 Colum. L. Rev. 1425, 1446 (1968). Those comments may explain the rationale of the draftsmen but they ignore the realities of the courtroom. So the task of instructing a jury with understandable guidelines is left to the courts to determine.

The New York appeals court in *People* v. *Patterson*, supra, utilized the trial court's definition that

"extreme" in the affirmative defense precluded mere annoyance or unhappiness or anger. To be "extreme," the disturbance had to be excessive and violent in its effect upon the individual driven to kill under it. *People* v. *Patterson,* supra, 293. When reading § 53a-54a in conjunction with the comments to the Model Penal Code from which it is drawn, it becomes apparent that an extreme emotional disturbance is one where self-control and reason are overborne by intense feelings such as passion, anger, distress, grief, excessive agitation or other similar emotions.

In *People* v. *Shelton,* 88 Misc. 2d 136, 149, 385 N.Y.S.2d 708 (1976), Justice Bentley Kassal made an exhaustive analysis of the affirmative defense in question. It is this court's opinion that the guidelines for determining extreme emotional disturbance as presented in that opinion with only a slight variation to include the *Patterson* observation are the ones that should be followed in this state.

Following *Shelton,* we hold that in determining whether the defendant has proven the affirmative defense of an extreme emotional disturbance by a fair preponderance of the evidence as a mitigation of murder to manslaughter the jury must find that: (a) the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the Penal Code; (b) the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and (c) the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions.

Consideration is given to whether the intensity of these feelings was such that his usual intellectual controls failed and the normal rational thinking for that individual no longer prevailed at the time of the act. In its charge, the trial court should explain that the term "extreme" refers to the greatest degree of intensity away from the norm for that individual.

The jury should be instructed that the reasonableness of a defendant's act under an extreme emotional disturbance is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be.

An examination of the court's charge on this issue shows that it was too narrow and was not in accord with the expanded limits of General Statutes § 53a-54a as amended in 1973.

There is error, the judgment is set aside and a new trial is ordered.

In this opinion the other judges concurred.