## THE STATE vs. JOHN CRONIN.

First Judicial District, Hartford, May Term, 1894. ANDREWS, C. J., TORRANCE, FENN, BALDWIN and HAMERSLEY, JS.

It is not essential to the admissibility of dying declarations that they should directly accuse the prisoner of being the assailant of deceased.

Such declarations may tend to show that the deceased was in actual danger of death at the time the declarations were made, and had given up all hope of recovery; and if so, are admissible to lay a foundation for the admission of other declarations, made substantially at the same time, to other witnesses, which do identify the prisoner as the assailant.

The defendant was on trial for murder in the first degree in shooting one S. His defense was that at the time of the alleged homicide he was incapable of deliberation and premeditation by reason of intoxication. *Held* that a remark of the accused on the day following the homicide indicating a clear recollection of statements made by and to him within a few minutes after the shooting on the previous day, were admissible as tending to prove that at the time of the homicide he could not have been so intoxicated as to be incapable of deliberation and premeditation; and admissible also as tending to show a guilty connection on his part with the crime charged.

[Argued May 3d—decided May 15th, 1894.]

INDICTMENT for murder in the first degree; brought to the Superior Court in Hartford County, and tried to the jury before *Ralph Wheeler, J.;* verdict of guilty, and appeal by the accused for alleged errors of the court in the admission of evidence. *No error.*

Upon the trial of the case, the State offered evidence to prove and claimed to have proved:—That at about seven o'clock on the morning of October 6th, 1893, the prisoner, John Cronin, who was familiarly called "Jack," walked straight to the house of the deceased, Albert J. Skinner, opened the outside door leading into the dining-room where the deceased was sitting at his breakfast with his back towards said outside door, walked into the dining-room, and deliberately shot the deceased from behind with a revolver, and that no witness saw the shooting. The bullet entered the left side of the back and passed through a rib, the spinal column, lung, stomach, spleen and other organs of his body.

That after he was shot, Skinner immediately arose from the table, walked a few steps to the door of the kitchen where his wife was at work, said to her, " I am shot, call for help," and fell unconscious to the floor. Mrs. Skinner at once ran into the dining-room, saw the accused standing in the room, and ordered him from the house. The prisoner immediately went out, and she closed and locked the outside doors. She then raised a window and screamed. A Mr. Vinton with his team and two or three hired men, one of whom was John L. Horton, were in the highway and heard the screams of Mrs. Skinner. Mrs. Skinner recognizing Mr. Vinton, called to him by name to come into the house. Cronin at this time was in the highway, and Mr. Vinton asked him : " What is the matter in the house ? I am in a hurry and don't want to get off unless it is absolutely necessary." The prisoner answered back : " If you want to know what is the matter there, you had better go in and see." Mr. Vinton hurriedly went into the house, followed by Mr. Horton and other of his men, and found Skinner lying apparently unconscious upon the floor where he had fallen, between the dining-room and the kitchen. Vinton inquired what was the trouble, but the deceased did not answer. Vinton and his men picked up the deceased immediately, carried him into the bedroom a few feet away, and laid him upon the bed. This was about ten minutes past seven o'clock. After Mr. Skinner was placed upon the bed, he regained his consciousness.

At this time Mrs. Skinner was unable to tell Mr. Vinton and the neighbors who had quickly assembled there what the matter with her husband was, and both Mr. Horton and a Mrs. Page asked the deceased what the matter was, nearly at the same time. To Mr. Horton he said, " Jack " (meaning Cronin) " shot me ; " and further said to him, " I shall die." In answer to Mrs. Page he said " I am shot ; " and further said, " I shall die. Oh, Lord, have mercy ; Lord have mercy, I shall die ; " and repeatedly declared to her, " I shall die." When making these declarations he turned himself over, and drawing his clothing up, showed the bul-

let hole in his back to both Mr. Horton and Mrs. Page. At the time these declarations were made, the deceased was in a dying condition, and they were made under a sense of impending death.

That Mr. Henry A. Page who lived about 200 feet or more from the residence of the deceased, saw the prisoner going into Skinner's yard, and in two or three moments thereafter heard the shot fired by the prisoner, and also the screams of Mrs. Skinner immediately following, and soon started for Mr. Skinner's house. He came up to the prisoner and said to him: " What is the matter, Jack? " Cronin answered: " I shot the damned dog, and I want to go in and finish the damned son of a bitch; " and that shortly afterwards Cronin was discovered endeavoring to work his way into the bedroom for the purpose of shooting Skinner a second time. Cronin was soon after arrested, and on his person a revolver of six chambers was found, one of which was then loaded.

The deceased died at a quarter before eight o'clock the same morning, from the effects of the wound.

At the trial, the accused did not deny, nor did he admit, that he shot and killed the deceased.

Counsel for the prisoner offered evidence to prove, and claimed to have proved, that the prisoner was intoxicated at the time of the homicide, and to such an extent that he was incapable of exercising the mental power of deliberation. The State offered direct evidence to prove, and claimed to have proved, that the accused was not intoxicated at the time of the killing.

The State, for the purpose of further proving that the prisoner killed the deceased willfully, deliberately, premeditatedly and with malice, and that he understood the nature, character and consequences of his act, offered evidence to prove, and claimed to have proved, that after the shooting he said to Mr. Vinton that he shot the deceased and that he was glad of it; that when he was informed that Skinner was dead he told a Mr. Walker who was standing by at the time that. he was damned glad of it, and that he meant to kill

him ; that to one Thomas R. Whaples he said, referring to Skinner: "I shot the damned dog, and I hope the son of a bitch will die;" that he admitted to one Alfred W. Moulton that he shot the deceased and hoped he would die, and that Moulton told him he might have "to stretch hemp by the neck for it;" and the accused replied that he didn't care a damn if he did.

The State also offered the testimony of Ransom W. Burnham, the constable who had the accused in charge, and of George A. Smith who was with Burnham, that on the morning after the homicide while they were conveying the accused from the Hartford jail to South Windsor for his preliminary examination, and when passing a field in which a Mr. Edwin Whaples was sitting, Cronin said, referring to Whaples: "There is a little cuss who owes me $47.50, and if my neck is stretched I suppose he thinks he will get rid of paying me."

The testimony of the Mrs. Page, above referred to, was in substance as follows:—Examined by the State's Attorney.

You are the wife of the last witness? Yes, sir, Mr. Henry A. Page.

Now upon the morning of this homicide did you go over to Mr. Skinner's? A. Yes, sir, I did.

You went in there, and after getting in there, what room did you go into? I went right into the * * *

Immediately after getting into the house? I spoke to Mrs. Skinner as I went into the house and asked her what was the matter, and as she didn't answer me I pushed the bedroom door open and went into the bedroom.

After you got into the bedroom, whom did you see? Why I saw Mr. Horton standing at the head of the bed, and Mr. Skinner lying on the bed, and he looked at me, and I thought he was dying, that was my first impression, that he was dying.

And you say Mr. Horton stood at the head of the bed? Yes, sir.

Any other person in the room? No, sir, no other person in the house.

You say you thought Mr. Skinner was dying? Yes, sir.

I never saw that look but once on a person's face. It was the same kind of look.

Did you speak to him ? . Yes, sir.  I said, " Why, Albert, what's the matter ? '

Objected to.

*Mr. O'Flaherty.*  You don't claim Mr. Skinner made any accusation at that time ?

*Mr. Eggleston.*  Yes, sir, I do.

*Mr. O'Flaherty.*  That he charged anybody with being the author of this ?

*Mr. Eggleston.*  Yes, sir.  I don't mean to have you understand that I am going to attempt to prove by this witness what another person heard during the time that he was there.  I am going to try to prove by this witness what he said, his condition, his apparent belief in impending death; in other words, what he said at this time he said under sense of impending death, and so expressed it to this woman ; in other words, if not admissible as *res gestæ*, it is admissible as a dying declaration.

You say you thought he was dying.  Yes, sir, I did.

What did you say to him and he to you ?  I said : " Why, Albert, what is the matter ? "  I have known him from a boy—and he said : " I am shot."  And I said : " Where, where ! "  And he turned himself over, and drawing his clothing up showed the bullet hole in the back, or said where it was,—showed us that, no blood having come out.  I made up my mind * * *

Objected to.

What did he saÿ ?  He says : " I shall die.  Oh, Lord, have mercy, Lord, have mercy, I shall die," and then turned.  He was in such agony he would turn and say : " I shall die, I shall die," he would say, and I felt that he was, and I couldn't say that he was not.  Mr. Horton passed out when I came in.  I picked up a piece of paper and folded it as well as I could in the shape of a fan and fanned him, for the sweat was rolling down his face, he was in such agony, and I said : " They have gone for the doctor, Albert."

Objected to.

State v. Cronin.

*Mr. O'Flaherty.* I claim it is inadmissible, what she thought.

*The Court.* Not what she thought, but his answer.

*Witness.* " Perhaps he can do something for you."

He said : " I shall die, I shall die." How many times? Quité a number of times, as he turned himself he would say : " Oh, I shall die."

Did Mr. Skinner make any complaint of being cold ? Yes, sir, he did. Finally, at the last turn I thought he was going to vomit, perhaps with blood that was coming up, and I stepped back and he turned,.flung himself almost off the bed in his agony, and then he turned back and said : " I am cold, cover me up." I spoke to his wife to bring me a comfortable, and she flung it and I covered him ; and I said : " Do you lie easier on that side?" It was the side he was shot on, and he said yes, he did. That was the last he said. He lived perhaps ten minutes from the time.

Cross-examination by *Mr. O'Flaherty.*

During the time that you were at the bedside of Mr. Skinner, did Mr. Skinner accuse anybody of shooting him ? He never mentioned the name of any. He said he was shot. That is all he said.

He did not accuse any one of shooting him? No, not to me. While you were there? No.

To anybody in your presence ? No, sir, he did not.

Or within your hearing? No, sir.

*Mr. O'Flaherty.* Now, your Honor, I shall ask that this testimony be stricken out. It is utterly immaterial.

*The Court.* The woman testifies that the man Skinner said to her that he was shot. It is true that perhaps the other evidence in the case would be sufficient to prove that fact without his declaration ; and yet his declaration is evidence, provided that it be shown clearly that at the time he made it he was under apprehension of death. The testimony of this woman as to what he said at the time indicating that he was under such apprehension, I. think, then, must be admitted as evidence upon the question whether his declara-

State *v.* Cronin.

tion that he was shot is admissible at all. I think it must be admitted.

Now I will ask you, Mrs. Page, if during the time you were at Skinner's bedside he accused anybody of having shot him? I said he said he was shot. I asked him what was the matter and he said: "I am shot." That is what he said.

But he didn't mention who shot him? No, he did not. Mr. Horton stood at the head of his bed when I went in. He had been with him all along until I came, and then he went for a physician.

And while Mr. Horton was there—I mean while you and Horton were together—he made no accusation against anybody then? No. He showed us where the bullet hole was in his back, and he went out for a physician, and I staid by him to help him all I could.

Counsel for the accused further objected to the court receiving the testimony of Ransom W. Burnham, the constable, and of George Smith who was with Burnham at the time, State's witnesses, to the declaration made by the accused on the day following the homicide, while being conveyed from the Hartford jail to South Windsor for his preliminary hearing, and while passing a field in which sat a Mr. Whaples, to wit: "There is a little cur" (meaning Whaples) "that owes me $47.50, and if my neck is stretched I suppose he thinks he will get rid of paying me." The court overruled the objection and received the testimony. At the time of the remark the shooting of Skinner was not spoken of. After the testimony of these witnesses to that declaration was admitted, counsel for the accused moved to strike it out, but the court denied the motion. The ground of the objection to this testimony, as stated by counsel for the accused at the time, was that it was immaterial and improper. To these rulings of the court, counsel for the accused took an exception.

There are two reasons of appeal, viz.:—I. That the court erred in admitting the testimony of Mrs. Page. II. That the court erred in admitting the testimony of the witnesses Burnham and Smith.

State v. Cronin.

*Hugh O'Flaherty* and *Henry D. Mildeberger*, for the appellant (the accused).

I. The court erred in admitting the declarations of the deceased as testified to by Mrs. Page.

The true reason for holding that dying declarations are admissible in trials involving the question as to how the declarant received his injuries, is briefly stated in Wharton's Criminal Evidence (Ninth Edition), page 208, § 278. "Dying declarations are admitted, from the necessity of the case, to identify the prisoner and the deceased, to establish the circumstances of the *res gestæ*, and to show the transactions from which the death results." The same reason is also given by Rice on Criminal Evidence, Vol. 3, paragraphs 330 to 341, inclusive, where the subject is clearly and exhaustively treated by the writer of this valuable work. *The State* v. *Bohan*, 15 Kan., 417–419.

There was no *necessity* for introducing these declarations. They threw no light on the question as to *who* shot Albert J. Skinner, the victim of the shooting. Skinner accused no one of shooting him, at least in the hearing of this witness. That he had been shot was not questioned or denied by the defendant at any stage of the case, during the time the cause was being tried.

The rule allowing the dying declarations of a person to be proven in a court of justice, is contrary to the rule which makes hearsay evidence inadmissible.

The court, in the case of *Reg.* v. *Hinds*, reported in Cox C. C., Vol. 8, page 300, uses this language with reference to the subject, viz. : " Speaking for myself, I must say that the reception of this kind of evidence is clearly an anomalous exception to the law of England, which I think ought not to be extended."

The court, in *Montgomery* v. *The State*, 80 Ind., page 348, says : " Witnesses may describe the condition of the injured person, and may repeat expressions uttered by the sufferer indicative of present pain, *but such descriptions and such expressions cannot be put into the form of dying declarations.* The highest office which can be rightfully allotted to a dy-

ing declaration is a statement of the transaction which occasioned death. Beyond this it cannot be extended without an invasion of settled and salutary principles." *State* v. *Wood*, 53 Vt., 563; *Collins* v. *Comm.*, 12 Bush, (Ky.,) 271, 272; Taylor on Evidence, 644.

II. The testimony of Mrs. Page was not admissible as a part of the *res gestæ*. The declaration of Skinner, "I am shot," was but a narrative of a past occurrence. "All the authorities agree, so far as we are advised, that a declaration which amounts to no more than a mere narrative of a past occurrence is not admissible, * * * and in Wharton's Criminal Evidence the same author says, at § 691 : ' The test is, were the declarations the facts talking through the party, or the parties talk about the facts.'" *Jones* v. *The State*, 71 Ind., 81–83 ; *Enos* v. *Tuttle*, 3 Conn., 250 ; *Russell* v. *Frisbie*, 19 id., 209 ; *Rockwell* v. *Taylor*, 41 id., 59 ; *Montgomery* v. *The State*, 80 Ind., 346 ; *Denton* v. *State*, 1 Swan., 281 ; *State* v. *Carlton*, 48 Vt., 642 ; *People* v. *Davis*, 56 N. Y., 101.

The two most able and lucid decisions covering the point under discussion can be found in *Sullivan* v. *Oregon R. & Nav. Co.*, 12 Oregon, 392—a civil case, and the criminal case of *The People* v. *Ah Lee*, 60 Cal., 88–92.

III. The court erred in receiving, against the defendant's objection, the testimony of the witnesses, Burnham and Smith, relative to the statement made about one Edwin Whaples, wherein the accused said : " There is a little cur (meaning Whaples) that owes me $47.50, and if my neck is stretched I suppose he thinks he will get rid of paying me." From the finding it appears that this evidence was offered by the State " for the purpose of proving that the prisoner killed the deceased willfully, deliberately, premeditatedly, and with malice, and that he understood the nature, character, and consequences of his act." The finding also states that " at the time of the remark the shooting of Skinner was not spoken of." The defense was gross intoxication—that the accused, at the time of the shooting (if he did it, for nobody saw him do it), was not in a condition, mentally, to have *premeditated* the murder of the deceased.

State *v.* Cronin.

How then could his condition the day *after* the shooting, affect the question whether, at the time that the deceased was shot, Cronin was intoxicated, and so grossly as to be incapable of the premeditation necessary to constitute the crime of murder in the first degree?

It was inadmissible for this further reason : That, on the face of it, it bears no relation whatever to the fact whether the accused was in any manner responsible for the death of Albert J. Skinner, or with the death or the cause thereof, of the said Skinner. It was used as a declaratory admission of the accused, in its nature confessional, that he would have his "neck stretched" for shooting the deceased. This conclusion is reached by a process of inductive reasoning, there being nothing in the statement to warrant such a conclusion. Wharton's Criminal Evidence, 9th Ed., pp. 628, 542; Rice on Criminal Evidence, Vol. 3, § 306. In American and English Encyclopædia of Law, Vol. 3, page 495, § 18, we find the rule stated that : "A confession to be given in evidence must be of the offense charged in the indictment. It is not competent to give in evidence any confession or declaration of the prisoner of his having committed similar crimes upon other occasions, or of his general disposition to commit them." In no sense of the word can this statement of the accused be called a confession. He merely stated, "If my neck is stretched," etc. Stretched for what, and by whom?

*Arthur F. Eggleston,* State's Attorney, and *George A. Conant,* Assistant State's Attorney, for the State.

I. As to the declaration of the deceased, "I am shot; I shall die; O Lord, have mercy; Lord have mercy; I shall die."

This entire declaration was offered, and was clearly relevant, to prove that the deceased was under the sense of impending death, and as a predicate for the subsequent introduction of a dying declaration made to Mr. Horton. Mr. Kerr, in his work on the Law of Homicide, says (page 442) that the consciousness of approaching death may be proved " by the *direct language* of the decedent, or may be inferred

* * * from other circumstances of the case." 3 Russ. on Cr. (9th Ed.), 266, (side page); 1 Greenl. on Ev. (14th Ed.), 158; *Commonwealth* v. *Thompson*, 159 Mass., 56, 59 (1893); *Regina* v. *Howell*, 1 C. & K., 689.

But, if the words "I am shot" should be severed from the other language of the declaration for separate consideration, they were nevertheless admissible, and actually admitted, as a dying declaration. It is charged in the indictment that the deceased was shot by the prisoner. What ground, then, for disputing the relevancy of a fact alleged in the indictment, and denied by the prisoner's plea? The fact that Skinner was shot is not merely relevant and material to the issue, but directly in issue.

The declaration in question was none the less admissible because it was offered by the State as a dying declaration, to prove a fact in issue. Greenleaf on Evidence, Vol. 1, § 156; 3 Russ. on Cr., 267 (side page); 1 Whart. on Crim. L., § 670; Stev. Dig. Ev. (Chase's Ed.), 60; 1 Bish. Crim. Pro. (3d Ed.), § 1207; Kerr on Hom., §§ 412–415; *Pace* v. *Commonwealth*, 89 Ky., 204, 210; *State* v. *Saunders*, 14 Ore., 300; *Warren* v. *State*, 9 Tex. App., 619; *State* v. *Draper*, 65 Miss., 335; *Oliver* v. *State*, 17 Ala., 587.

II. This declaration was also admissible as part of the *res gestæ. Commonwealth* v. *McPike*, 3 Cush., 181; *Commonwealth* v. *Hackett*, 2 Allen, 136; *Lund* v. *Tyngsborough*, 9 Cush., 36; *Irby* v. *The State*, 25 Tex. App., 203; *Fulcher* v. *The State*, 28 id., 365.

III. As to the statement of the prisoner : " There is a little cur " (meaning one Whaples) "that owes me $47.50, and, if my neck is stretched, I suppose he thinks he will get rid of paying me." This declaration was relevant and material. It shows that the prisoner killed Skinner with malice and deliberation. Now this declaration of the accused was made within 30 hours after the homicide, and does not stand alone. It cannot be isolated, separated from the other facts of the case, and the other admissions of the prisoner; it belongs to a chain of confessions, all the same in form and substance, all pervaded with the same spirit of ill-will towards Skinner

and cold satisfaction over his death. They start from the pistol shot, and include the declaration in question. Alike in the main points of comparison, they bespeak a common origin.

The prisoner's sole defense was, that he was so intoxicated at the time of the homicide, as to be incapable of exercising the mental power of deliberation, of forming the specific intent to kill. This defense put in issue a mental condition, to wit, whether the prisoner had mind and capacity enough to enable him to judge of the nature, character and consequences of the act charged in the indictment, and that the commission of it would expose him to penalties. If he had, his defense would avail nothing, under the decisions of this court in *State* v. *Swift*, 57 Conn., 496, 510 ; *State* v. *Smith*, 49 id., 376, 381, 382; *State* v. *Johnson*, 41 id., 584, 588; 40 id., 136, 139, 142; *Commonwealth* v. *Trefethen*, 157 Mass., 180, 188; *State* v. *Hoyt*, 46 Conn., 330, 336; *State* v. *Alford*, 31 id., 40, 43; *Bartram* v. *Stone*, 31 id., 159, 161; *Barthelemy* v. *People*, 2 Hill, 248, 257, note b.

ANDREWS, C. J. In respect to the first reason of appeal we think there is no error. The declarations of the deceased to which Mrs. Page testified, were not only admissible as dying declarations, but were very clearly admissible because they tended to show that the deceased, at the time he made the declarations to which Mr. Horton testified, was in fact near death, as well as under a sense of impending dissolution. It was for this purpose, mainly, that the court admitted the testimony. Dying declarations are admissible only when it is shown to the satisfaction of the judge that the declarant was not only in actual danger of death, but had given up all hope of recovery at the time the declarations were made. Stephen's Digest of Evidence, Article 26 ; Best on Evidence, §§ 82, 505; 1 Greenleaf on Evidence, § 158; *State* v. *Swift*, 57 Conn., 496.

The other reason of appeal presents a somewhat different question. Whenever any person is on trial for a criminal offense, it is proper to show his conduct, as well as any declarations made by him subsequent to the alleged criminal

act, which may fairly be supposed to have been influenced by that act. The manner in which he conducted himself when accounts by others in respect to the subject were made in his hearing, may always be shown. If he should be in possession of, or should attempt to conceal, anything acquired by the crime, or should make false statements respecting himself, or as to his whereabouts at the time of the affair, these might be shown; because such conduct or such statements often tend to show a guilty connection by the accused with the crime charged. *Commonwealth* v. *Tolliver*, 119 Mass., 312; *Commonwealth* v. *Trefethen*, 157 Mass., 180; *State* v. *Williams*, 27 Vt., 724. The declarations of the accused to which the witnesses Burnham and Smith testified seem to us to fall within this rule.

There is another ground also upon which proof of these declarations was equally admissible. The appellant was on trial for the crime of murder in the first degree. As the homicide with which he was charged was not perpetrated by poison, or by lying in wait, or in committing or attempting to commit any of the crimes named in the statute, he could only be convicted of the crime charged by evidence which enabled the jury to find that it was a willful, deliberate and premeditated killing. A deliberate intent to take life is an essential ingredient of that offense, and the existence of such intent must be shown as a fact; and it must be shown that there was a specific intent to take life which was formed prior to the act of killing, so that the jury can say that that act was willful, deliberate and premeditated. *State* v. *Johnson*, 40 Conn., 136; *State* v. *Smith*, 49 id., 376.

The defense offered evidence and claimed to have proved that the accused at the time of the homicide was in such a state of mind from intoxication that he was incapable of deliberation. This evidence it was the duty of the jury to consider. Intoxication is admissible to be proved in such case, not as an excuse for crime or in mitigation of the punishment, but as tending to show that the accused, if guilty at all, is only guilty of a less offense than that named in the indictment. *The People* v. *Fish*, 125 N. Y., 136.

VOL. LXIV.—20

It is in this aspect of the case that the evidence of the witnesses Burnham and Smith becomes significant. It is stated in the finding that the accused told Mr. Moulton " that he had shot Skinner and hoped he would die." This could have been not more than a few minutes after the shooting, and while he must have been in the same condition of intoxication that he was at the time he fired the fatal shot. It also appears that Moulton said in reply to the accused, that " he might have to stretch hemp by the neck for it." Now the words which the accused made use of in speaking of Whaples, as related by these witnesses, repeated this expression of Moulton with singular fidelity. While the words are not literally the same, yet the idea—that of neck stretching—is precisely identical in both. The accused was then on his way from the county jail in Hartford, in the care of the officer, to his preliminary hearing upon the act he had committed the morning before. On the journey nothing had been said about the shooting of Skinner. There was nothing at that time to suggest " neck stretching " except his own memory. It was more than twenty-four hours after the homicide. He was not then intoxicated. If his recollection of what had taken place the previous morning within a very few minutes of the time he killed Skinner was so clear that he could repeat the very idea there used, and almost the identical words, it certainly tended to show—not that he might not have been intoxicated—but that he could not have been *so* intoxicated as to be incapable of deliberation and premeditation. It was a fact proper to be laid before the jury.

There is no error in the judgment appealed from.

In this opinion the other judges concurred.