STATE OF CONNECTICUT *v.* EARL REID
(11317)

PETERS, PARSKEY, SHEA, GRILLO and SPADA, Js.

Argued April 11—decision released July 17, 1984

*Charles Hanken,* with whom, on the brief, was *Richard Emanuel,* for the appellant (defendant).

*Julia D. Dewey,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, *Michael Dearington,* chief assistant state's attorney, and *Glen Reynolds,* law student intern, for the appellee (state).

SHEA, J. A jury found the defendant guilty of murder[1] in causing the death of Laverne Dowdy, and manslaughter in the first degree[2] in causing the death of

---

[1] At the time of the offense, General Statutes § 53a-54a (a) provided: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[2] At the time of the offense, General Statutes § 53a-55 (a) provided: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or (2) with intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of exteme emotional disturbance, as provided in subsection (a) of section 53a-54a, except that the fact that homicide was committed

Steven Phillips. In this appeal he maintains the court erred (1) in admitting into evidence his postarrest statements; (2) in charging the jury on the issues of extreme emotional disturbance and the failure to produce a missing witness; (3) in commenting on the evidence during the charge; (4) in denying a motion for mistrial after the prosecutor engaged in improper conduct; and (5) in refusing to grant his motion for acquittal.[3] We find no error.

The evidence presented at trial disclosed the following: At approximately 9:30 p.m. on March 29, 1979, the defendant, Earl Reid, met with Steven Phillips at the latter's apartment on Franklin Street in New Haven. The purpose of their meeting was to transact a sale of one-quarter of an ounce of cocaine that Reid possessed. Both men remained in Phillips' bedroom during the course of negotiations over the price and quality of the illegal substance. During this time several peo-

under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subsection; or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

[3] The defendant has raised two other claims that may be disposed of summarily. The first is that the court failed to instruct the grand jury on the affirmative defense of extreme emotional disturbance. This claim is not reviewable, however, because the defendant failed to file a motion to dismiss the indictment. *State* v. *Gunning,* 183 Conn. 299, 439 A.2d 339 (1981). The defendant also maintains that the number of peremptory challenges he was granted was improper under General Statutes § 54-82g because two indictments (not informations) were lodged against him, entitling him to thirty-six challenges and not eighteen. This claim is without merit. In *State* v. *McGee,* 80 Conn. 614, 618, 69 A. 1059 (1908), we construed the predecessor to General Statutes § 54-82g to encompass both informations and indictments. Nothing has occurred in the ensuing seventy-five year development of that statute which leads us to believe that the General Assembly has now intended a different result. Accord *McDonald* v. *Haynes Medical Laboratory, Inc.,* 192 Conn. 327, 332, 471 A.2d 646 (1984). The defendant received the number of peremptory challenges to which he was entitled.

ple, one of whom was Laverne Dowdy, came to visit with Phillips or to test the cocaine. Dowdy remained in the bedroom with the other two men.

At approximately 11:30 p.m., Winifred Phillips, who was the sister of Steven Phillips, and John Everet, a neighbor, were watching television in the living room of Phillips' apartment when they heard the sound of gun shots coming from Steven Phillips' bedroom. A few seconds later, the defendant entered the living room and stated "Steve tried to get me" or "I shot your brother because he tried to get over on me."

A police officer, who had been notified of the shooting, arrived at Phillips' apartment at approximately 11:55 p.m. Upon entering the back bedroom he found Steven Phillips lying on the floor and Laverne Dowdy reclining on a cement block. Both men had been shot fatally in the chest and head.

At trial the defendant admitted shooting Phillips and Dowdy, but claimed it was in self-defense. He maintained that the two victims had left the bedroom and then returned for the purpose of robbing him. He claimed that as he tried to leave the bedroom, Phillips struck him with a pistol on the left side of his face. A struggle ensued in which Reid was able to knock Phillips' gun to the floor. Dowdy then grabbed Reid from behind. According to Reid, Phillips then yelled, "[g]et the gun." Reid claimed that he then was in fear for his own life; he reached into his coat pocket, grabbed his gun, and fired three shots at Phillips, who was standing in front of him. He then turned and shot Dowdy who was standing behind him.

The state produced evidence contradicting the narrative of events given by the defendant. An expert witness testified that he had examined the clothing worn by Dowdy on the night of the shooting, and concluded

that Dowdy was sitting down when he was shot.[4] The state also produced evidence establishing that no gun was ever found on the floor of the bedroom.[5] Finally, both Winifred Phillips and John Everet testified that they did not hear any sound of a struggle in the bedroom prior to hearing the shots fired.

## I

The defendant's first claim of error concerns the admission into evidence of his postarrest statements. In order to address this claim properly it is necessary to set out the circumstances under which the statements were made.

After the shooting, the defendant fled to New York where he was arrested on April 18, 1979. While under arrest in New York, Reid requested and was permitted to use the telephone. A police officer, sitting nearby, overheard the defendant state, "tell Warren to get rid of the stuff and to get the three witnesses," or "get the three witnesses lined up."

Thereafter, on April 19, 1979, the defendant was driven by two New Haven police officers back to New Haven. The defendant was twice informed of his *Miranda*[6] rights and then questioned by the police officers. In response to a question asked by one of the police officers, the defendant stated that he did not know either of the victims, nor had he ever been to the apartment where they were shot.

---

[4] The expert arrived at this conclusion by examining the clothing worn by Dowdy the night of the shooting, and discovering that a bullet had passed through the right shoulder of the tan jacket and blue vest, but had not pierced Dowdy's right shoulder. From this the expert concluded that the articles of clothing must have been in a relaxed position, up off Dowdy's body. He concluded that Dowdy must have been sitting down, otherwise, the clothing would have been drawn closely to Dowdy's body.

[5] A gun was found in Phillips' desk drawer, however.

[6] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

The defendant filed a motion to suppress all the statements, maintaining that they were obtained in violation of *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The trial court granted the motion in part, concluding that the statements made to the New Haven police were obtained without a valid waiver of the defendant's *Miranda* rights. With respect to the statement overheard by the New York police officer, however, the court concluded that it was not barred by *Miranda* and was relevant to establish consciousness of guilt.

At trial the defendant took the stand and testified that he had shot the victims in self-defense. On cross-examination he was questioned concerning the prior inconsistent statement given to the New Haven police.[7] The court also permitted the New York police officer to testify to the statements he overheard.

---

[7] "Q. Mr. Reid, when you were brought back from New York by New Haven officers, were you advised of the nature of the charges against you?

"A. Yes, I was.

"Q. And what you were accused of doing?

"A. Yes, I was.

"Q. Do you recall telling Detective Granger and Detective Smith that you didn't know either of the victims and that you had not been in that apartment?

"A. Yes, I remember.

"Q. You did say that?

"A. Yes."

On recross-examination the prosecutor again questioned the defendant concerning his conversation with the New Haven police:

"Q. When you were coming back from New York with the New Haven police officers and you denied knowing anything about the victims or knowing the victims or being there, you lied to them; didn't you?

"A. I didn't want Detective Granger—is that his name?

"Q. Sir, did you lie to them?

"A. I wouldn't say I lied. I just wanted them to stop talking to me.

"Q. What you told them wasn't true?

"A. No, it wasn't.

"Q. So, it was a lie?"

In this appeal the defendant claims that he was motivated to speak to the New Haven police officers because they would not permit him to remain silent. He further claims that he told the police that he did not know the victims in order to stop any further questioning. He characterizes the statement as the "functional equivalent of silence," and argues that it was inadmissible under *Doyle* v. *Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).[8] He further claims that this prior inconsistent statement does not fall under the exception allowing statements obtained in violation of the *Miranda* exclusionary rule to be used for impeachment of a defendant who has testified. See *Harris* v. *New York,* 401 U.S. 222, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971). Finally, the defendant maintains that the statements he made which were overheard by the New York police officer were irrelevant and, therefore, inadmissible.[9]

## A

In *Doyle* v. *Ohio,* supra, the Supreme Court held that it was a denial of due process for a prosecutor to impeach a defendant's trial testimony by commenting on the defendant's failure to speak after being given *Miranda* warnings. "The basis for that decision is twofold. First,

---

[8] Although the defendant did not distinctly raise this issue at trial; Practice Book § 3063; we have in the past reviewed this claim under *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). See *State* v. *Cook,* 174 Conn. 73, 75-76, 381 A.2d 563 (1977); *State* v. *Briggs,* 179 Conn. 328, 335, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980). We are presented with no reason to depart from our prior practice.

[9] The defendant has not challenged the trial court's ruling on his motion to suppress these statements. Similarly, he does not contend that this case is governed by *State* v. *Ferrell,* 191 Conn. 37, 463 A.2d 573 (1983) (Evidence of a telephone conversation between defendant and his attorney obtained by police eavesdropping was excluded where police had invited defendant to use their telephone but failed to provide the privacy essential to the exercise of the right of counsel.) His sole claim is that the statements were irrelevant evidence. Accordingly, we will limit our discussion to that issue.

'every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested.' . . . And secondly, in view of the implicit assurance inherent in the *Miranda* warnings that silence will carry no penalty, 'it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.' " (Citation omitted.) *State* v. *Briggs,* 179 Conn. 328, 340, 426 A.2d 298 (1979) (*Bogdanski, J.,* dissenting), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980).

A clear distinction has been made, however, between the use of silence for the purpose of impeaching a defendant and the use of his prior inconsistent statements: "*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all. See *United States* v. *Agee,* 597 F.2d 350, 354–56 (CA3) (en banc), cert. denied, 442 U.S. 944 [99 S. Ct. 2889, 61 L. Ed. 2d 315] (1979); *United States* v. *Mireles,* 570 F.2d 1287, 1291–93 (CA5 1978); *United States* v. *Goldman,* 563 F.2d 501, 503–504 (CA1 1977), cert. denied, 434 U.S. 1067 [98 S. Ct. 1245, 55 L. Ed. 2d 768] (1978)." *Anderson* v. *Charles,* 447 U.S. 404, 408, 100 S. Ct. 2180, 65 L. Ed. 2d 222 (per curiam), reh. denied, 448 U.S. 912, 101 S. Ct. 27, 65 L. Ed. 2d 1173 (1980).

Nor can the defendant prevent the prosecutor from introducing prior inconsistent statements into evidence merely by characterizing the statements as "the functional equivalent of silence." The defendant's motive for speaking is simply irrelevant with regard to the

admissibility of the evidence. So long as the statements are voluntarily made, they are admissible for purposes of impeachment.[10]

### B

The defendant claims that even if the statements are not barred from introduction into evidence by *Doyle* v. *Ohio,* supra, they are, nevertheless, not within the exception to *Miranda* established in *Harris* v. *New York,* supra. In essence the defendant claims that *Harris* prohibits the defendant only from committing perjury and, where the prior inconsistent statements do not expose "in-court perjury," they should not be admitted. He claims that no perjury was exposed by his prior inconsistent statements because he admitted in court that he had been at the scene of the crime and knew the victims. We interpret *Harris* more broadly than does the defendant.

Although the Supreme Court was naturally concerned with criminal defendants using *Miranda* as "a license to use perjury by way of a defense"; *Harris* v. *New York,* supra, 226; the opinion also stressed that a defendant could not use *Miranda* to shield direct testimony from "the traditional truth-testing devices of the adversary process." (Footnote omitted.) Id., 225; see also *United States* v. *Havens,* 446 U.S. 620, 627–28, 100 S. Ct. 1912, 64 L. Ed. 2d 559 (1980); *Oregon* v. *Hass,* 420 U.S. 714, 722–23, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975). The prosecution employed an acceptable method of testing the general credibility of a witness in this case. Prior inconsistent statements have been considered an effective method of testing veracity. Depriving the prosecution of this well-established tool for eliciting the truth

---

[10] Of course, involuntary or coerced statements are absolutely inadmissible. See *New Jersey* v. *Portash,* 440 U.S. 450, 99 S. Ct. 1292, 59 L. Ed. 2d 501 (1979); *Mincey* v. *Arizona,* 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). In this case the trial court found the statements to be voluntarily made, a determination the defendant has not challenged on appeal.

would only marginally advance the policies of the exclusionary rule, while concurrently frustrating society's need to arrive at the truth. Cf. *United States* v. *Havens,* supra. Permitting evidence of any voluntary prior inconsistent statement obtained in violation of *Miranda* in order to impeach the defendant's general credibility is wholly consistent with the rationale of *Harris* v. *New York,* supra. We find no error here.[11]

C

The defendant maintains that the court erred in admitting into evidence his postarrest statements which were overheard by the New York police officer. He claims that the statements were irrelevant. We disagree.

"In a criminal trial, it is relevant to show the conduct of an accused, as well as any statement made by him subsequent to the alleged criminal act, which may fairly be inferred to have been influenced by the criminal act. *State* v. *Cronin,* 64 Conn. 293, 304–5, 29 A. 536 [1894]. The state of mind which is characterized as 'guilty consciousness' or 'consciousness of guilt' is strong evidence that the person is indeed guilty; 2 Wigmore, Evidence (3d Ed.) § 273; and, under proper safeguards . . . is admissible evidence against an accused. *United States* v. *Friedman,* 445 F.2d 1076, 1081 (9th Cir. [1971]); *Harrell* v. *United States,* 220 F.2d 516 (5th Cir. [1955]); *State* v. *Holliday,* 159 Conn. 169, 268 A.2d 368 [1970]; *State* v. *Leopold,* 110 Conn. 55, 66–67, 147 A. 118 [1929]; *In re Durant,* 80 Conn.

---

[11] The defendant maintains in his brief that this court should depart from the rationale of *Harris* v. *New York,* 401 U.S. 222, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971), and adopt an absolute exclusionary rule as a matter of state constitutional law. Although we have interpreted article first, § 8 of our Connecticut constitution to provide greater guarantees than its federal counterpart; *State* v. *Ferrell,* 191 Conn. 37, 463 A.2d 573 (1983); we decline to do so in this instance. We find the reasoning in *Harris* v. *New York,* supra, persuasive and adhere to that decision.

140, 151, 67 A. 497 [1907]; *State* v. *Caliendo,* 136 Me. 169, 4 A.2d 837 [1939]; *State* v. *Mills,* 51 N.J. 277, 240 A.2d 1, cert. denied, 393 U.S. 832, 89 S. Ct. 105, 21 L. Ed. 2d 104 [1968]; 1 Wharton, Criminal Evidence (12th Ed.) § 209. . . . Before evidence is allowed to be given, however, the court must also consider whether its prejudicial tendency outweighs its probative value. *State* v. *Marquez,* 160 Conn. 47, 52, 273 A.2d 689 [1970]; *State* v. *Johnson,* 160 Conn. 28, 33, 273 A.2d 702 [1970]; *State* v. *Holliday,* supra, 173." *State* v. *Moynahan,* 164 Conn. 560, 595–97, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973); see also *State* v. *Maturo,* 188 Conn. 591, 597, 452 A.2d 642 (1982).

The defendant's statement, "tell Warren to get the witnesses lined up" or "get the three witnesses lined up" tends to reflect a "consciousness of guilt" on his part by showing an attempt to fabricate an alibi. The statement was admissible to show conduct inconsistent with a claim of innocence similar to the defendant's flight to New York after the crime. Moreover, under the circumstances of this case "[t]he trial court, considering the context and content of the defendant's statements, quite properly could have concluded . . . that in balancing their probative value against their prejudicial tendency the scales weighed in favor of their admissibility." *State* v. *Maturo,* supra, 598.[12]

## II

The defendant's next claim of error concerns two jury instructions given by the court, the first concerning the defendant's affirmative defense of extreme emotional

[12] The defendant claims that the term witnesses is ambiguous because he could have also been referring to witnesses necessary to obtain bail. The fact that evidence is susceptible of different explanations or would support various inferences does not affect its admissibility, although it obviously bears upon its weight. So long as the evidence may reasonably be construed in such a manner that it would be relevant, it is admissible.

disturbance for mitigating the crime of murder to manslaughter and the second concerning the defendant's failure to produce a missing witness. See *State* v. *Kish,* 186 Conn. 757, 771, 443 A.2d 1274 (1982).

## A

In charging the jury on the affirmative defense of extreme emotional disturbance the court gave an instruction closely resembling the instruction we found erroneous in *State* v. *Elliott,* 177 Conn. 1, 7–10, 411 A.2d 3 (1979).[13] The defendant's exception to this charge failed, however, to "state distinctly the matter objected to and the ground of the exception." Practice Book § 854. The defendant's counsel on appeal, who was also counsel at trial, has candidly acknowledged this deficiency, but maintains that we should review this error under *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973).

---

[13] The pertinent excerpt of the jury instruction is as follows:

"What does extreme emotional disturbance mean? It means a sudden frenzy or passion of the slayer; that is, the accused in this case inflamed by some provoking cause that, naturally, might be expected to carry for the moment a reasonable man beyond the bounds of self-control; that is, a man may be suddenly and grossly insulted or provoked or confronted with an unexpected situation with such gross or ostensible indignity to his feelings that what he does under the first hot spur of impulse and indignity is to be weighed and considered in the law with a human reference to the provocation under which he attacked as a result of it.

"The indignity charged, insult or whatever it may be, the provocation, the impulse or passion, must be sudden, unanticipated and so gross and over-powering in its character, as to wipe out all sane self-control and for the time-being carry the man dominated by it beyond will power and all reason and restraint.

"A trivial provocation such as a word or an insult will not in and of itself form the basis for a claim of extreme emotional disturbance. Only when the wrong done is so outrageous in its nature that it arouses anger, fear, terror or other emotions to such an extent that self-control is overcome may it be termed an extreme emotional disturbance. However, if after the provocation the blood of the man subjected to it has had time to cool or if the killing, in fact, was not due solely to the extreme emotional disturbance but was in whole or in part actuated by something else such as hatred or desire for revenge, then extreme emotional disturbance cannot be said to have caused the action of the man."

Compare *State* v. *Elliott,* 177 Conn. 1, 4 n.2, 411 A.2d 3 (1979).

This court will review claims of error not brought to the attention of the trial court only under "exceptional circumstances": "[T]he first is . . . where a new constitutional right not readily foreseeable has arisen between the time of trial and appeal. . . . The second 'exceptional circumstance' may arise where the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial." *State* v. *Evans,* supra, 70.

The defendant does not maintain that his claim of error concerns a newly discovered constitutional right not readily foreseeable at the time of trial, but maintains that the trial court's erroneous instruction deprived him of his right to establish a defense and denied him a fair trial. Although we have in the past acknowledged that an erroneous jury charge may impair a defendant's right to establish a defense; *State* v. *Corchado,* 188 Conn. 653, 660, 453 A.2d 427 (1983); *State* v. *Miller,* 186 Conn. 654, 660-61, 443 A.2d 906 (1982); we do not believe the instruction here was so prejudicial as to deny the defendant a fair trial.

The court charged the jury that extreme emotional disturbance "means a sudden frenzy or passion of the slayer; that is, the accused in this case inflamed by some provoking cause that, naturally, might be expected to carry for the moment a reasonable man beyond the bounds of self-control; that is, a man may be suddenly and grossly insulted or provoked or confronted with an unexpected situation with such gross or ostensible indignity to his feelings that what he does under the first hot spur of impulse and indignity is to be weighed and considered in the law with a human reference to the provocation under which he attacked as a result of it." This portion of the charge, which we found improper in *State* v. *Elliott,* supra,[14] adequately sets

[14] In *State* v. *Elliott,* 177 Conn. 1, 411 A.2d 3 (1979), the defendant claimed that his extreme emotional disturbance resulted from problems beginning

forth the defendant's position. The defendant main-
tained that when he was struck with the gun by Phillips
he became enraged and fearful for his own safety, pro-
voking him to draw his own weapon and begin shoot-
ing.[15] There was no evidence or claim of any emotional
disturbance prior to that time, as defense counsel con-
ceded during the course of his objection to the court's
commentary on the evidence: "My claim is after they
[Dowdy and Phillips] got back into the room, is when
the extreme emotional disturbance arose." This portion
of the charge was wholly compatible with the defend-
ant's theory.

Nor do we believe that the court's reference to a
"cooling period" denied the defendant a fair trial. The
court's charge that, "if after the provocation the blood
of the man subjected to it has had time to cool . . .
then extreme emotional disturbance cannot be said to
have caused the action of the man," can be reasonably
construed to direct the jury's attention to whether the
defendant's emotional disturbance had subsided so that
he could reflect upon his course of action at the time
he fired. The charge continued: "So, if before provo-
cation, a purpose to kill has been formed in the mind
of the person which in whole or in part actuated the
crime or if the emotion aroused by the provocation has
so far spent itself that the person doing the killing had
time to make a rational choice to kill or not to kill, then,
again, the extreme emotional disturbance cannot be
said to have caused the action of this defendant." The
court then referred to the claim of the defendant that

in childhood and continuing to his adulthood as well as an overwhelming
fear of his brother. Id., 3. The reference to heat of passion in that case
undercut his affirmative defense, narrowing the scope of conduct contem-
plated by the statute. Id., 10. No similar evidence indicating that the defend-
ant suffered from some psychiatric abnormality was presented in this case.

[15] The defendant would not have been allowed to rely on the fact that
he was engaged in an illegal transaction for two hours in order to establish
the requisite provocation causing an extreme emotional disturbance. See
Model Penal Code and Commentaries (A.L.I.) § 210.3 (1980).

"he suddenly became extremely emotionally disturbed" when he was struck in the face with a pistol by Steven Phillips as well as to the position of the state that Phillips had no gun in his possession and that what had transpired in the room prior to the shooting did not indicate any extreme emotional disturbance on the part of the defendant.

" 'To determine whether an error in a charge constitutes reversible error, the court must consider the whole charge. . . .' In considering the charge as a whole we eschew critical dissection . . . thereby not passing upon the instructions attacked in 'artificial isolation' from the whole charge. '. . . The charge must be considered from the standpoint of its effect on the jury in guiding them to a proper verdict." (Citations omitted.) *State* v. *Corchado,* supra, 660–61. In reviewing the charge given by the court, we conclude that the defendant's claim of extreme emotional disturbance, which did not under the evidence presented include such aspects as "brooding," extended stressful circumstances or any abnormal psychiatric condition, was fairly presented to the jury. The defendant claimed, as an alternative to his self-defense theory, that his self-control was overborne by the fear and agitation suddenly provoked by the victims' attack upon him. That being the only basis upon which the jury could reasonably have found the defendant to have sustained his burden of proving this affirmative defense, the failure of the charge to discuss broader grounds which might support such a defense under different circumstances did not prejudice him. We cannot say, therefore, that this defendant "has clearly been deprived of a fundamental constitutional right and a fair trial." *State* v. *Evans,* supra, 70.[16]

---

[16] Although we find no error under the circumstances of this case, we reiterate that trial courts should not give the heat-of-passion instruction when charging the jury on the affirmative defense of extreme emotional distress. The heat-of-passion instruction unduly narrows the factual circum-

## B

The defendant also maintains that the court erred in giving a missing witness instruction. See *State v. Carrione,* 188 Conn. 681, 453 A.2d 1137 (1982); *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 165 A.2d 598 (1960). The facts relevant to this issue are as follows: Prior to the commencement of trial the defendant requested permission for his sister to sit in the courtroom during trial. He admitted, however, that she would be called as a witness. The state objected and the request was denied.

Thereafter, the defendant took the stand and testified that following the shooting he drove toward Massachusetts, and later that night, returned to his sister's apartment in New Haven. Upon arrival he encountered his sister and Jeffrey Laforte, who was living with the defendant's sister. He told Laforte about the shooting and, shortly thereafter, both men went to a local bar to have a drink. The defendant was eventually driven to New York City by Laforte.

Laforte testified that the defendant arrived at the apartment at approximately midnight and was in a state of hysteria. Laforte further stated that the defendant's sister, Dolores Reid, was present when the defendant entered the apartment, but was told to go to another room by Laforte. Finally, Laforte stated that he noticed a welt on the defendant's cheek, and that the defendant said he had been attacked.

At the conclusion of trial the state requested an instruction that an adverse inference should be drawn because the defendant had failed to call Dolores Reid as a witness. See *Secondino* v. *New Haven Gas Co.,* supra. The defendant objected, maintaining that his sis-

stances that might otherwise qualify for consideration by the jury as evincing an extreme emotional disturbance. See *State* v. *Elliott,* 177 Conn. 1, 7–10, 411 A.2d 3 (1979).

ter's testimony would have been cumulative and that she was not, therefore, a witness he would naturally call to testify. See *State* v. *Carrione,* supra, 688. The objection was overruled and the instruction given. The defendant claims the court erred by giving the instruction because he would not have naturally produced his sister to testify, as her testimony was merely cumulative and, in any event, she was equally available to both parties.

We disagree with the defendant that the subject matter of his sister's testimony would have been cumulative. The defendant maintained that he was justified in shooting both Phillips and Dowdy because they had attacked him. The only witness who supported the defendant's account of his agitated state and the wound on his cheek after the event was Laforte. Both factors tended to corroborate the defendant's portrayal of what had occurred at the scene of the crime. Laforte was, however, subjected to a rigorous cross-examination, creating doubts about his credibility. Under these circumstances, Dolores Reid's testimony would not have been merely cumulative. The testimony of an additional witness upon a significant issue in dispute can hardly be thus characterized. The defendant and Laforte admitted that Dolores had been present when the defendant first returned to his sister's apartment. She would, therefore, have had an opportunity to verify Laforte's account of the defendant's emotional condition and the welt on his face. Her testimony would not have been merely cumulative, but would have enhanced the defendant's claim of self-defense by bolstering other testimony which had been greatly weakened on cross-examination.

The defendant also claims that the state was not entitled to the *Secondino* charge because Dolores Reid was equally available to the state. Although it may be within the power of either party to produce certain evi-

dence, if that evidence "was so related to the whole proof in the case that one of the parties and not the other would be expected to produce it, an inference would be justified that the [evidence], if produced, would be unfavorable to that party." *Turner* v. *Scanlon,* 146 Conn. 149, 161, 148 A.2d 334 (1959). The defendant's sister was available as a witness and, since she had the opportunity to observe his condition soon after the crime, it would have been natural for him to produce her testimony if favorable. *Broderick* v. *Shea,* 143 Conn. 590, 124 A.2d 229 (1956). Furthermore, the defendant did not advance his argument of equal availability at trial in compliance with our rules. See Practice Book §§ 288, 3063.

### III

The defendant next claims that the court made several misstatements of fact when charging the jury and gave such an unbalanced review of the evidence that the defendant was deprived of a fair trial. We disagree.

"Within constitutional limitations concerning trial by jury, the nature and extent of the trial court's comments on the evidence must largely depend on the facts involved in a particular case and the manner in which it has been tried. . . . While a trial court has not only the right but often the duty to comment upon the evidence . . . it is not licensed to 'indulge in an argumentative presentation of the claims of one side.' . . . In a word, ' "[i]nstructions should not be so drawn as to direct the attention of the jury too prominently to the facts in the testimony on one side of the case, while sinking out of view, or passing lightly over portions of the testimony on the other side which deserve equal attention." ' " (Citations omitted.) *Bruneau* v. *Quick,* 187 Conn. 617, 628, 447 A.2d 742 (1982); see also *State* v. *Cari,* 163 Conn. 174, 303 A.2d 7 (1972).

The present case lasted approximately eleven days not including a three day weekend occurring at mid-trial. Numerous witnesses were called and the jury was asked to resolve conflicting accounts concerning the shooting. The jury was further required to consider two different degrees of culpability involving four different distinguishing factors.[17] Under these circumstances the court properly commented extensively on the evidence presented.

Although the trial court made a few misstatements with regard to the evidence,[18] these errors were not of great significance and were presumptively cured by the court's charge that the jury's recollection of the testimony should control. We have reviewed the court's comments on the evidence and find no favoritism as alleged by the defendant.

## IV

During the course of trial, while Jeffrey Laforte was being cross-examined by the prosecutor, the following colloquy occurred:

"Q. You just got out of prison; didn't you?

"A. Yes.

"Q. You are on parole?

"A. That's correct."

The defendant immediately objected to the last question, and the court sustained the objection and

---

[17] The jury was charged on the crimes of murder and all three subsections of manslaughter in the first degree.

[18] For example, the court referred to the gun that Steven Phillips allegedly struck the defendant with as an automatic. Reid testified, however, that it was a revolver.

instructed the jury to disregard the question and the response.[19] The defendant's request for a mistrial was denied.

The defendant maintains that the prosecutor's misconduct in inquiring whether Laforte was on parole, despite the curative instruction, was of such a nature as to deny the defendant a fair trial. Prosecutorial misconduct[20] generally falls within one of three different categories: " 'those comments whose effects may be removed by appropriate instructions . . . those which are flagrant and therefore deny the accused a fair trial' "; (citations omitted) *State* v. *Falcone,* 191 Conn. 12, 22, 463 A.2d 558 (1983); and those "remarks deliberately intended to undermine the rulings of the trial court to the prejudice of the defendant." *State* v. *Ubaldi,* 190 Conn. 559, 575, 462 A.2d 1001, cert. denied, 462 U.S. 1001, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983).

The defendant makes no claim that the misconduct here falls within the third category, but claims that the prejudice resulting from the impropriety could not be cured by the curative instruction to disregard the inquiry. We disagree. The question asked, although clearly irrelevant and improper, concerned a collateral matter and not an issue central to the trial. Compare *State* v. *Binet,* 192 Conn. 618, 473 A.2d 1200 (1984). Moreover, the jury had already been informed that Laforte had been convicted of two felonies; the fact that they were also made aware that he was on parole would not in itself substantially detract from their assessment of his credibility and thus prejudice the defendant.

[19] The curative instruction given by the court was as follows: "Now, before I excused you, there was an objection that was made to a question that was asked of this witness. I will instruct you now to disregard both the question and any response to the question by this witness. Therefore, the question and response are to have no relevancy to you or any bearing on any consideration as to guilt or innocence of this defendant."

[20] The state makes no attempt to justify the prosecutor's irrelevant question, apparently conceding that it was improper.

The defendant makes no claim that the curative instruction given to the jury was in any way defective or incomplete. *State* v. *Ubaldi,* supra, 563. "We have often held that a prompt cautionary instruction to the jury regarding improper prosecutorial remarks obviates any possible harm to the defendant. See *State* v. *Nowakowski,* 188 Conn. 620, 624, 452 A.2d 938 (1982)." *State* v. *Ubaldi,* supra, 563. There was no error in denying the defendant's motion for a mistrial.

V

In his final claim of error the defendant maintains that the court erred in denying his motion for acquittal because the evidence was insufficient to establish his guilt beyond a reasonable doubt.

"In determining whether the evidence is sufficient to sustain a verdict, 'the issue is whether the jury could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt.' . . .'' (Citations omitted.) *State* v. *Giguere,* 184 Conn. 400, 402–403, 439 A.2d 1040 (1981); see also *Jackson* v. *Virginia,* 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560, reh. denied, 444 U.S. 890, 100 S. Ct. 195, 62 L. Ed. 2d 126 (1979). Furthermore, because the jury was not instructed[21] to specify which subsection of General Statutes (Rev. to 1979) § 53a-55 (a) the defendant violated, "the judgment cannot be supported unless the evidence was sufficient to establish guilt under each statutory provision which the trier may have relied upon. *Leary* v. *United States,* 395 U.S. 6, 31–32, 89 S. Ct. 1532, 23 L. Ed. 2d 57 (1969); *Yates* v. *United States,* 354 U.S. 298, 312, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 (1957)." *State* v. *Marino,* 190 Conn. 639, 651, 462 A.2d

---

[21] The defendant did request that the jury specify which subsection of General Statutes § 53a-55 (a) was violated, but the trial court denied the request.

1021 (1983).[22] We find there was sufficient evidence to support a conviction under each of the three subsections of § 53a-55 (a). Similarly, we find there was sufficient evidence to support a conviction of murder under § 53a-54a (a).

[22] This principle has been applied to invalidate a general verdict of guilty not only where one of the alternative grounds for the conviction submitted to the jury is constitutionally infirm; *Leary* v. *United States,* 395 U.S. 6, 31–32, 89 S. Ct. 1532, 23 L. Ed. 2d 57 (1969); *Yates* v. *United States,* 354 U.S. 298, 311–12, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 (1957); *Williams* v. *North Carolina,* 317 U.S. 287, 63 S. Ct. 207, 87 L. Ed. 279 (1942); *Stromberg* v. *California,* 283 U.S. 359, 368, 51 S. Ct. 532, 75 L. Ed. 1117 (1931); but also where it is insufficiently supported by the evidence. *Cramer* v. *United States,* 325 U.S. 1, 36 n.45, 65 S. Ct. 918, 89 L. Ed. 1441 (1945). In all of these cases the error has been that of the judicial authority in allowing the jury to consider an improper basis for a conviction under circumstances where it is impossible to tell whether the conviction rests upon the impermissible ground.

This principle which involves error in the charge to the jury must not be confused with the rule that where a guilty verdict is returned on an information charging several acts in the conjunctive the information is not defective in relation to the verdict if the evidence is sufficient with respect to any of the acts charged. *Turner* v. *United States,* 396 U.S. 398, 420, 90 S. Ct. 642, 24 L. Ed. 2d 610, reh. denied, 397 U.S. 958, 90 S. Ct. 939, 25 L. Ed. 2d 144 (1970); *Crain* v. *United States,* 162 U.S. 625, 634–36, 16 S. Ct. 952, 40 L. Ed. 1097 (1896); *State* v. *Eason,* 192 Conn. 37, 42, 470 A.2d 688 (1984); *State* v. *Edwards,* 163 Conn. 527, 535, 316 A.2d 387 (1972); *State* v. *Cofone,* 164 Conn. 162, 168, 319 A.2d 381 (1972). That rule originated in cases where a conviction was challenged by a motion in arrest of judgment claiming deficiencies in the indictment or information, not where error was claimed in the instructions to the jury. *Claassen* v. *United States,* 142 U.S. 140, 146–47, 12 S. Ct. 169, 35 L. Ed. 966 (1891); *Crain* v. *United States,* supra. It allows the state to sustain its burden of proving the offense by presenting sufficient evidence upon any one of several alternative statutory grounds without the necessity of proving all of those alleged. It does not authorize consideration by a jury of grounds not supported by the evidence but presumes that the verdict relies only upon those with a sufficient evidential basis. In acknowledging that a charging document may be broader in scope than the evidence produced at trial, we have recognized that "[i]t is the duty of the court to submit to the jury only those issues which are relevant not only to the pleadings but also to the facts in evidence and to submit to the jury no issue foreign to the facts in evidence." *State* v. *Cofone,* supra, 168. It is error for a court to submit to a jury as a basis for a conviction any statutory alternative ground unsupported by the evidence. See *Bonner* v. *Winter,* 175 Conn. 41, 47, 392 A.2d 436 (1978); *Hamill* v. *Neikind,* 171 Conn. 357, 361, 370 A.2d 959 (1976). "In [such]

With respect to subsection (a) of § 53a-55, which requires that the defendant cause a death when intending only to cause serious physical injury, we note that there is nothing in the evidence concerning Steven Phillips' death that would compel a jury to conclude that the defendant intended to kill him. The defendant testified that after he freed himself from Dowdy's grasp he began shooting in self-defense. From this the jury could as reasonably infer that the defendant intended to cause serious physical injury as that he intended to cause death. See *State* v. *Marino,* supra.

The jury could also have reasonably concluded that the defendant was under an extreme emotional disturbance, as required by subsection (2) of § 53a-55 (a), when he shot Phillips. The defendant testified that he was extremely frightened for his own life prior to the shooting, and that because of this he shot Phillips, who, according to the defendant, struck him with a revolver. Other jurisdictions have found similar factual patterns sufficient to sustain a guilty verdict of manslaughter in the first degree. See, e.g., *State* v. *Carson,* 292 Or. 451, 640 P.2d 586 (1981) (en banc) (defendant shot at victim after victim attacked defendant and defendant's relatives).

---

circumstances we think the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Yates* v. *United States,* 354 U.S. 298, 312, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 (1957).

In the present case the court did instruct the jury upon the three alternative subsections of § 53a-55 (a) and it is, therefore, necessary to review the evidence to determine whether it was sufficient to support a verdict under each of them. The defendant sufficiently preserved his right to such review by requesting that the jury specify which of the alternative subsections of General Statutes § 53a-55 (a) they had relied upon. In *State* v. *Marino,* supra, 651, the failure of the three judge panel to indicate upon which of these alternatives the guilty finding was based, as required by Practice Book § 3060D, necessitated either a remand for further articulation or a review of the evidence with respect to each alternative to determine its sufficiency.

There was also sufficient evidence for the jury to conclude that the defendant recklessly engaged in conduct creating a grave risk of death, which in fact caused Phillips' death, as required by § 53a-55 (a) (3). The defendant testified at one point: "I'm looking both ways because, like I said, to me everybody is moving. I don't know if I'm hitting these people. Like I said, I'm not trying to do anything. I'm trying to get these people off me so I can get out of this house." From this and other testimony the jury could have reasonably concluded that the defendant shot randomly and recklessly, and as a result caused Phillips' death.

There was also ample evidence from which the jury could have reasonably concluded that after having first disposed of Phillips the defendant shot Dowdy with the intention of causing his death. The defendant admitted that Dowdy may have been backing away when he shot him; evidence which, if the jury had accepted it as credible, could have been the basis for the jury's conclusion that the death was intentional. Nor was the jury required to find that the defendant was under the influence of an extreme emotional disturbance when he shot Dowdy in view of a lapse of time between the shootings and the fact that Dowdy, who was not claimed to have been armed, then posed no great threat to the defendant. On the basis of the defendant's testimony, the jury could have reasonably concluded that the defendant had regained control of his faculties when he shot Dowdy.

There is no error.

In this opinion the other judges concurred.