******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

McDONALD, J., with whom D'AURIA and ECKER, Js., join, concurring. This is a textbook case that demonstrates, in both dramatic and dangerous fashion, what can go wrong when the police improperly conduct an interview of a suspect. Although I agree with the majority that the judgment of conviction should be affirmed and join its opinion, I write separately to highlight the deeply troubling—perhaps even reckless—manner in which state police officers conducted the interrogation of the defendant, James Maharg, while he was in a seriously compromised medical state as a result of long-term alcohol abuse.[1] The actions of these officers seriously endangered the defendant's physical health, violated both the defendant's constitutional rights and state police policy, and needlessly jeopardized the integrity of the investigation and the ensuing prosecution of this case, all of which undermined the ends of justice.

I begin by emphasizing the shockingly disturbing circumstances under which the state police conducted the defendant's interrogation, for approximately *thirteen hours*, while the defendant was clearly in the dangerous throes of alcohol withdrawal. Trooper Isaiah Gonzalez responded to the defendant's house around 2:20 a.m., following the defendant's 911 call reporting that the defendant found the victim, the defendant's husband, Thomas Conley, lying on the floor "dead" after having hit his head on a kitchen cabinet earlier that evening. As the trial court noted, at that time, "the defendant made several spontaneous statements in [Gonzalez']

---

[1] The defendant was convicted of murder in violation of General Statutes § 53a-54a (a) and tampering with or fabricating physical evidence in violation of General Statutes § 53a-155. On appeal, the defendant does not challenge his conviction of tampering with or fabricating physical evidence.

presence, including that he and the [victim] ha[d] been drinking a lot since they lost their business and that they had been drinking earlier that evening." At the scene, police officers observed "alcohol bottles" on the kitchen counter, noting that "[s]ome [of the bottles] were empty, [and] some were not." At approximately 4 a.m., the defendant was transported to State Police Troop A barracks in Southbury. As the trial court found, during the first hour of the interrogation at the police station, Gonzalez and Detective Jared Barbero discussed, among other things, "the fact that the defendant had consumed a significant amount of alcohol the prior evening."

Barbero and another detective, Ed Vayan, proceeded to interrogate the defendant for another approximately twelve hours, despite the defendant's repeated requests to terminate the interview. To compound the disturbing nature of the interrogation, the police officers continued the interrogation even though the defendant was visibly shaking, and they acknowledged that the defendant was exhibiting signs of alcohol withdrawal. The defendant's shaking was so intense that he was unable to sign his name on the *Miranda* notice form to purportedly "certif[y]" that he had been "advised" of his constitutional rights. Instead, at Vayan's direction, the defendant was told to "just make [his] mark" on the form. As witnessed by Barbero and Vayan, this is the "mark" of the defendant:



It is hard to imagine that, given the defendant's condition, he was able to meaningfully understand the constitutional rights the police purportedly advised him of, much less that he understood how to meaningfully exercise them. For hours during the intensely suggestive interrogation, in addition to violently shaking, the defendant vomited numerous times and repeatedly denied having killed the victim. Ultimately, the defendant acceded to the officers' suggested narrative that he had used a hatchet to murder the victim—which was never supported by any physical evidence—and thus confessed to killing the victim. It was not until approximately thirteen hours into the interrogation, after the defendant had a seizure, that the defendant was transported to a hospital for alcohol withdrawal treatment. Under these extraordinary circumstances, I am hardpressed to understand why the state did not readily acknowledge, at oral argument before this court, that the police interrogation in this case was inexcusable and violated the defendant's constitutional rights, as the three judge trial court determined when it granted the defendant's motion to suppress with respect to the entire thirteen hour interview.

To be clear, the state police seriously endangered the defendant's health by ignoring his obvious signs of physical distress and urgent need for medical treatment. As the trial court found, "[f]rom the outset of the interview, both Barbero and Vayan understood that the defendant had been drinking very heavily at the time of the incident. Barbero and Vayan talked about the defendant's need to sober up and observed the defendant shaking to the point that he could neither hold a cup of coffee steady nor legibly sign his own name [on] the *Miranda* form." A few hours into the interview, the defendant pleaded with Barbero and Vayan that he "need[ed] a drink so bad." In response, Barbero stated, "[y]eah, I can see the withdrawal all over you." The

defendant made additional pleas of, "[o]h my God, I need a drink so bad," and "I can't stand it, I can't stand this shaking." The trial court found that, instead of seeking immediate medical assistance, "[t]he detectives responded by putting the defendant in a cell." The defendant was then brought back into the interview room, at which point he told the police officers, "I need to go to the hospital to get off this, and I need detox." The defendant subsequently stated, "I need help." Vayan responded, "I know you do," and, notwithstanding that acknowledgment, he and Barbero proceeded to continue questioning the defendant. It was only after the defendant began experiencing a seizure and became "cyanotic"[2] that the ordeal finally came to an end and an ambulance was called. By placing the defendant in serious medical jeopardy, the officers' treatment of the defendant can only be described as recklessly indifferent.[3]

Even putting aside the indifferent nature of law enforcement's treatment of the defendant, the officers' actions needlessly jeopardized the integrity of the investigation and subsequent prosecution of the defendant. Moreover, Barbero testified that state police policy required that state police officers bring a suspect exhibiting signs of alcohol withdrawal to a medical facility.

[2] When paramedics arrived, Barbero told them that the defendant was in "[a]lcohol withdrawal" and that he went "cyanotic," which, as the trial court explained, indicated "that his skin had turned a bluish color." See Merriam-Webster's Collegiate Dictionary (11th Ed. 2014) p. 310 (defining "cyanosis" as "a bluish or purplish discoloration (as of skin) due to deficient oxygenation of the blood").

[3] "[A]cute alcohol withdrawal . . . can cause significant illness and death. Some patients experience seizures, which may increase in severity with subsequent [alcohol withdrawal] episodes. Another potential [alcohol withdrawal] complication is delirium tremens, characterized by hallucinations, mental confusion, and disorientation." L. Trevisan et al., "Complications of Alcohol Withdrawal: Pathophysiological Insights," 22 Alcohol Health & Rsch. World 61, 61 (1998), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC6761825/pdf/arh-22-1-61.pdf (last visited July 7, 2025).

Barbero and Vayan clearly did not abide by that policy, and, when asked at oral argument whether those officers were ever disciplined for that violation, the state responded, "I do not know." In a case such as this, the state would be well served to come to oral argument before this court equipped with information and persuasive arguments for why this court need not take action to ensure law enforcement's compliance with state law and its own internal policies. Discipline is one such piece of information. Without knowing such information, the state does nothing meaningful to quell concerns when the state police so brazenly ignore their own policies and, more importantly, the law. My own independent review of the record does not reveal that Barbero and Vayan were ever disciplined in any manner for their actions.

These observations about the police officers' actions in this case are far from irrelevant. Courts must often consider whether there are policies or other incentives or disincentives in place to ensure that state officials conform their conduct to law. As we have recently noted, courts regularly struggle to acquire reliable information about whether existing constitutional or prophylactic rules are working (or new ones are desirable) to deter misconduct that violates not only the rights of those who become suspects, targets or criminal defendants, but the rights of all of us who are members of a free society. Indeed, this is not the only case in this court year in which we have had to grapple with this challenge. For example, in *State* v. *Haynes*, 352 Conn. 236, A.3d (2025), we were asked to devise a new prophylactic rule under the state constitution for instances in which the state wants to use an illegally obtained statement to impeach the trial testimony of a defendant in a criminal case. See id., 250–51 and n.10. Although we declined, over a spirited dissent; see id., 264 (*Ecker*, *J.*, concurring and dissenting); to overrule

a prior case from this court addressing this question; see *State* v. *Reid*, 193 Conn. 646, 480 A.2d 463 (1984); we observed that "[t]he legitimacy of prophylactic constitutional rules derives from their necessity. . . . There is general agreement that courts should use their authority to devise prophylactic rules cautiously and to tailor them to be as narrow as possible to accomplish their purpose. . . . Courts create prophylactic rules when they determine that the risk of a constitutional violation is sufficiently great [such] that simple case-by-case enforcement of the core right is insufficient to secure that right. . . . This court has demonstrated that it will devise and implement additional prophylactic rules, beyond those that federal law compels, when we are persuaded that they are necessary to protect the constitutional rights within our state." (Citations omitted; internal quotation marks omitted.) *State* v. *Haynes*, supra, 250–51 n.10.

Our consideration of whether to adopt a new or modified prophylactic rule under state law is not the only instance in which we will often look to whether there are other incentives or disincentives in place to ensure that state officials will conform their conduct to law. To cite one example, when we are faced with the question of whether to extend absolute immunity to state actors for actions taken in the course of their duties, one relevant consideration is whether there are sufficient checks in place that discourage state officials from violating the law. See, e.g., *Mitchell* v. *Forsyth*, 472 U.S. 511, 522–23, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985) ("[M]ost of the officials who are entitled to absolute immunity from liability for damages are subject to other checks that help to prevent abuses of authority from going unredressed. Legislators are accountable to their constituents . . . and the judicial process is largely self-correcting: procedural rules, appeals, and the possibility of collateral challenges obviate the need for dam-

ages actions to prevent unjust results." (Citation omitted.)); *Khan* v. *Yale University*, 347 Conn. 1, 28–29, 295 A.3d 855 (2023) ("[b]ecause absolute immunity removes the threat of private defamation actions in order to incentivize witnesses to participate candidly and willingly in the proceeding, it is crucial that there be some strong deterrent, such as the threat of a perjury prosecution, against abuse of the privilege by the giving of untruthful testimony").

In sum, there are various circumstances in which courts look for policies or other rules that may ensure a public official's compliance with state law, short of this court stepping in to ensure such compliance. It is incumbent on the state to assure this court that there are mechanisms in place to ensure compliance with state law and to protect an individual's constitutional rights. In this case, we have no assurances that existing measures are sufficient to deter the type of reckless indifference exhibited by the police officers. Such assurances could have included, for example, the fact that the officers were disciplined as a result of their violation of state police policy or that their reckless indifference may have jeopardized their qualified immunity. The state cannot simply rely on the absence of *any* relevant evidence or an agreed on measure of determining the prevalence of similar violations to avoid the development of a new rule.

Here, there is no question that the police officers were aware that the defendant had been drinking heavily at the time of the incident and was in the throes of alcohol withdrawal during the interrogation. Indeed, the trial court found as much. For example, and in addition to the evidence already discussed, when asked at the probable cause hearing whether the defendant appeared to have been drinking, Gonzalez stated that "[the defendant] did have . . . [a] smell or . . . odor emanating from him that smelled like it could [be an]

. . . alcohol-like substance, yes." At trial, Gonzalez acknowledged that he remembered testifying at the probable cause hearing that the defendant had smelled like alcohol. Vayan testified at the probable cause hearing that, during the police interrogation, the defendant told him that "there was a lot of alcohol consumption involved" on the night of the murder. Vayan also testified that the defendant was intoxicated "earlier" in the interrogation and that he could smell alcohol on the defendant during the interrogation. Barbero testified at trial that the defendant had "tremors" and "[s]hakes" during the interview but that the police did not "test his breath or . . . blood" to determine if he was intoxicated.[4]

It is eminently reasonable for the public to expect law enforcement to treat suspects within its custody in a professional and humane manner, without needlessly endangering their health and well-being. At a bare minimum, law enforcement must follow its own policies when it comes to caring for suspects within its custody. In the present case, the police officers did neither, and we have no assurances that their blatant breach of protocols was an isolated incident. I am deeply concerned that the officers acted with reckless indifference to the defendant's health and that the state did not find these actions troubling enough to even inquire of the state police regarding any disciplinary action taken or additional training that these officers may have received as a result of their actions. As a consequence, we have not been offered any of the necessary assurances this court needs to determine whether the acts of these officers were isolated in nature, rather than a part of a more widespread, systemic problem that might require this court to take action.

---

[4] Although the defendant's blood alcohol concentration was not tested, the victim's postmortem blood alcohol concentration was 0.393 according to a toxicology report.

Nevertheless, because the trial court properly suppressed any statements made by the defendant during the approximately thirteen hour station house interrogation, we can expect that this ruling should serve to deter future misconduct. Accordingly, I agree with the majority that the judgment of conviction should be affirmed.

I would, however, hope and expect that it would not take the trial court's exclusion of the statements that the defendant made during the interrogation to incentivize law enforcement to follow clear law and policy. Put differently, I do not consider this a paradigmatic case that our system worked. One of the purposes of the exclusionary rule is to deter police misconduct, but not only in cases that end up being litigated. If we were to suspect that the exclusion of evidence in a case that went to trial did not sufficiently deter misconduct, we might conclude that a particular aspect of our system is not working, requiring, in an appropriate case, that we devise a more robust rule.

For the foregoing reasons, I respectfully concur.